OFFICE MATES 5, NORTH SHORE, INC., Plaintiff-Appellant, v. ANNE HAZEN *et al.*, Defendants-Appellees.

First District (1st Division)   No. 1—91—0284

Opinion filed August 3, 1992.—Rehearing denied September 30, 1992.

Hamman & Benn, of Chicago (Dawn M. Cassie, of counsel), for appellant.

Sheldon Schwartz, of Buffalo Grove, for appellee Anne Hazen.

Beermann, Swerdlove, Woloshin & Barezky, of Chicago (Alvin R. Becker and Timothy M. Kelly, of counsel), for appellee Deborah Greenberg.

No brief filed for other appellee.

PRESIDING JUSTICE BUCKLEY delivered the opinion of the court:

On December 24, 1990, plaintiff Office Mates 5, North Shore, Inc., an office support personnel placement agency, filed suit against defendants Anne Hazen (Hazen) and Deborah Greenberg (Greenberg), two of its previous employees, and defendant Premier Personnel, Inc. (Premier), a competing placement agency and current employer of Hazen and Greenberg. Plaintiff's suit alleges that Hazen's and Greenberg's employment with Premier violates restrictive covenants contained in employment agreements which Hazen and Greenberg executed as a condition to their employment; that all defendants are in violation of the Illinois Trade Secrets Act (the Act) (Ill. Rev. Stat. 1989, ch. 140, par. 351 *et seq.*); and that defendant Premier has intentionally interfered with plaintiff's contractual relations.

Plaintiff subsequently obtained a temporary restraining order against defendants and moved for preliminary injunctive relief on all grounds alleged in the complaint. Following a hearing, the circuit court entered an order which denied plaintiff's request for preliminary injunctive relief and dissolved the temporary restraining order. On appeal, plaintiff alleges that its evidence raised a *prima facie* case demonstrating a fair question as to the near-permanency of its client relationships and confidentiality of its customer information. Plaintiff accordingly argues that the circuit court abused its discretion in denying it preliminary injunctive relief. We affirm.

Plaintiff is an Illinois corporation with its principal place of business located in suburban Northfield. Plaintiff is part of a nationwide franchise headquartered in Cleveland, Ohio. Plaintiff and its predecessor, Office Mates 5, Northfield, Inc., which plaintiff purchased in October 1988, have been in the personnel placement business since 1985.

Plaintiff's business consists of locating and placing office support personnel (candidates) with Chicagoland businesses (clients) having such a need. Plaintiff receives a fee for its services. The industry is highly competitive, as there are 100 similar agencies within a 50-mile radius of plaintiff's business.

Plaintiff principally conducts its business through individuals holding the title of account executive. An account executive's primary goal is to match a qualified candidate with the particular hiring needs of a client. An account executive's day-to-day duties are directed at achieving this goal. Plaintiff pays its account executives a commission for successful placements.

Defendants Hazen and Greenberg were employed as account executives with plaintiff from October 1986 through October 1990 and from July 1988 through October 1990, respectively. Neither Hazen nor Greenberg had worked for a placement agency prior to her job with plaintiff. On November 7, 1990, Hazen and Greenberg began working for defendant Premier in a similar capacity. Premier is in direct competition with plaintiff and is located approximately seven miles away.

As a prerequisite to employment with plaintiff's predecessor, Hazen and Greenberg were required to enter employment agreements containing restrictive covenants which individually required Hazen and Greenberg to: (1) refrain for one year after termination from providing placement services to, or communicating with, candidates or customers, wherever located, with whom she either had contact, knowledge, or access during a 12-month period prior to termination; (2) not engage in the personal placement business in any capacity for one year following termination within a 50-mile radius of plaintiff's business; and (3) never disclose following termination "any information of any kind, nature or description whatsoever concerning any matters affecting or relating to plaintiff's personnel placement business."

Following plaintiff's commencement of this action, the circuit court on December 28, 1991, temporarily restrained defendants Hazen and Greenberg from using or disclosing any records obtained by them in the course of their employment with plaintiff. On January 2, 1991, the court ordered further that Hazen and Greenberg return plaintiff's confidential materials and that all defendants refrain from initiating contacts with customers of plaintiff "with whom Hazen or Greenberg had contact, knowledge of, or access to during the twelve months immediately preceding their termination *** and with whom plaintiff claims a 'near-permanent' relationship." Plaintiff attached a list of 260 companies to the order which plaintiff claimed satisfied the language of the order.

Defendants subsequently filed their verified answer to plaintiff's complaint and moved to dissolve the temporary restraining order. While defendants admitted executing their respective employment

agreements, they denied the enforceability of the restrictive covenants and any breach thereof.

On January 16, 1991, the court held a hearing on the parties' respective motions. During this hearing, the court received testimonial and documentary evidence and, over defense objection, various affidavits. What follows is a summary of the evidence produced.

Lynne Goldberg, plaintiff's president and owner, testified at the hearing and by way of sworn affidavit that the process involved in placing a qualified candidate with a client first requires plaintiff to develop a ready supply of candidates. To accomplish this goal, plaintiff principally relies on newspaper and directory assistance advertisement to attract candidates although candidates also learn about plaintiff through referrals and cold calls. Goldberg reviewed records reflecting that plaintiff spent about $52,000 on advertising in 1989 and about $39,000 through the end of October 1990. Plaintiff also pays referral fees if a referred candidate is successfully placed.

Candidates who reply to plaintiff's advertisement are interviewed by plaintiff's account executives. Information from the candidate, such as employment and education history, references and desired position, are taken down onto a candidate's application form. When plaintiff receives a job order matching a candidate's qualifications, the account executives arrange interviews, prepare the candidate for the interview, debrief them afterward, relay and negotiate any offers, and then finalize the placement. Information learned in the process relative to the candidate and client is transferred into plaintiff's files.

Regarding client development, plaintiff requires its account executives to place 40 telephone calls a day. Plaintiff requires its account executives to place any information learned by the calls onto "pump" and "lead" cards. An initial call rarely results in a job order; rather, the majority of job orders require that additional contact be made through personal visits to the business and additional telephone calls. Most placements take six months to a year to occur.

Plaintiff bears the costs associated with client development. When plaintiff purchased its predecessor, part of the purchase price was apportioned to client goodwill and client information contained within the predecessor's files. To maintain and develop its clients, plaintiff pays for Christmas cards, lunches, gifts, telephone bills, brochures and literature. Plaintiff must also pay a national franchise fee.

Once a client decides to place a job order, the account executive completes a job order form. This form includes, *inter alia*, data about the job duties, the skills required and salary requirements. Additional time is taken to assure that the information within the order remains

current. Every Monday, Wednesday and Friday, plaintiff holds office meetings during which account executives share job orders and candidate information to obtain a successful match.

Upon a successful placement, a job placement form is completed. Plaintiff pays a split commission to the account executives who supplied the successful candidate and obtained the job order. After placement, account executives make additional contact with the client to promote a positive relationship and goodwill. Over one-third of plaintiff's clients have used plaintiff's services for three years or more and 50% of plaintiff's revenues stems from customers who use plaintiff's services for multiple job placements.

Plaintiff considers confidential the information it acquires regarding its customers and candidates. Plaintiff maintains the confidentiality of this information as well as any customer lists by restricting access to its account executives on a "need to know" basis. Master copies of job orders and candidate applications are stored in a locked filing cabinet to which only plaintiff's president and her assistant have access. Additionally, plaintiff requires its account executives to execute confidentiality agreements and advises account executives of this confidentiality through training manuals and video tapes. A security guard protects plaintiff's premises after closing.

In addition to expenses associated with candidate and client development, plaintiff also incurs expenses when training its newly hired account executives. Upon an account executive's hire, the executive views a series of videotapes purchased from the franchise office. Initial training of account executives requires a two- to three-week period. Such training teaches techniques regarding marketing, sales, closing a placement, telephone use, personal visits to client offices and office procedures. Plaintiff also purchases from franchise headquarters videos updating industry practice which its account executives view. Account executives attend regional meetings annually at plaintiff's expense where guest speakers conduct skill-oriented seminars.

Each account executive keeps a job order book, which categorizes job orders from clients according to the nature of the work. Goldberg found Greenberg's book after she had left plaintiff's employ but was unable to locate Hazen's. Following Hazen's and Greenberg's resignations, certain confidential information—originals of candidate applications, client lists, job order forms, and other paperwork—were missing. Both Greenberg and Hazen had access to this information.

Goldberg identified a print-out of telephone calls for plaintiff's business which included calls from plaintiff to defendant Premier during October 1990. Hazen and Greenberg had taken extensive time off

in the second half of October, and plaintiff's photocopying bill for October demonstrated a marked increase. Hazen and Greenberg possessed keys to plaintiff's office.

Although plaintiff's revenues have increased substantially over the last two years, plaintiff's November 1990 revenues suffered a marked decrease in comparison to its revenues during 1989. Account executives with plaintiff have also suffered losses of commissions.

During the hearing, Goldberg identified a list of companies attached to the temporary restraining order in which she claimed that plaintiff had a protectable interest. She based this assertion on the fact that all the companies there listed had paid a fee to plaintiff within the last three years as well as the time, effort and expense involved in acquiring that fee. Goldberg admitted that the list could include companies which had paid only one fee three years ago as well as companies which perhaps had gone out of business. Regarding one company on her list, Goldberg acknowledged that the company had two locations in Chicago and was listed on the New York Stock Exchange. The company employs hundreds of office personnel and plaintiff does not place all the personnel needs of that company.

Goldberg testified that clients would sometimes give her an exclusive to fill a particular job opening. Such exclusives, however, would never be in writing and would only apply to the opening which the client sought filled.

Goldberg testified about a client called Household International, with whom plaintiff has successfully placed many candidates. While plaintiff had accepted job orders from it prior to Greenberg's hire, it was Greenberg who placed a candidate which thereby procured them as a "client."

Plaintiff called Hazen as an adverse witness. Hazen testified that she primarily worked on candidate development during her first year. After this period, Hazen acted principally as a telephone solicitor. Her goal was to find local companies having office and other support personnel. Hazen testified that her main sources of customer names were the telephone directory and directories available at public libraries which focus on a particular industry. Hazen would then make "cold calls" to these companies to determine the person in charge of hiring personnel and to solicit job orders.

Hazen testified that, although plaintiff maintained a central file of "lead cards" in the president's office, Hazen found them unhelpful. Hazen testified that she would frequently plan her next day of calls at home and would use a directory to target a particular industry or a geographic location. Plaintiff's lead cards could not be taken out of

the office and generally included only a company name, address and telephone number. These cards would not, therefore, allow Hazen to efficiently market plaintiff's services as would the directories she used. Hazen noted that the lead cards were sometimes outdated and sometimes included businesses such as gas stations and restaurants. On the other hand, Hazen could learn a lot about a company through a directory and a telephone call.

Hazen testified that she generally would obtain the lead card on a potential customer only after she had first independently established contact with the company. Plaintiff required that all information gathered on a company be placed on the lead card. Thus, to the extent Hazen's handwriting appeared on a lead card, the entry was made after she learned of the company through her own efforts. Hazen testified she turned a lead card into a client only twice during her four-year tenure with plaintiff.

Hazen prepared and identified a list of 20 companies with whom she claimed she had found herself, personally cultivated a relationship and earned a commission. Hazen claimed these companies to be her "clients." Hazen explained that she initially found these companies on her own by using either a directory, canvassing or viewing a newspaper advertisement. Hazen admitted that some of these companies had been contacted by plaintiff's other account executives prior to Hazen's initial contact with that company. She further admitted that plaintiff's other account executives had in fact written job orders with some of these companies prior to Hazen's first job placement with that company. Hazen explained that there were a lot of account executives going after the same client. Hazen acknowledged that, after starting with Premier, she contacted some of the same companies with which she had previously cultivated relationships. Hazen denied taking any records with her when she left plaintiff's employ.

Plaintiff also called Greenberg as an adverse witness. Greenberg testified that she too would plan her next day's calls the night before and would also plan such calls by principally using telephone books and directories such as the Illinois service and manufacturing directory. Greenberg conceded that there existed no single directory which listed companies needing office workers as such, but stated that every telephone book and directory was a source of potential clients. Some weeding out was always required.

As for plaintiff's lead cards, Greenberg testified that they contained nothing more than the name, address and telephone number of the company. Greenberg would, therefore, still have to place a cold

call to the company to determine the name of the contact person and develop a rapport with that person.

Greenberg testified that repeat business depended more on the relationship of the account executive and the customer than it did on a particular successful placement. Greenberg noted that companies with whom she had a relationship would make placements with other agencies. The companies would frequently come back to Greenberg for another placement even though the company had accepted a previous placement from another placement agency. No business hired office workers on a regular or predictable basis.

Greenberg denied taking any records with her when she left plaintiff. After starting for Premier, Greenberg contacted and wrote job orders for some of the same customers with whom she had cultivated relationships while working for plaintiff. Greenberg, like Hazen, prepared and identified a list of companies with which she had developed a personal relationship and which she considered to be her clients. As with Hazen, plaintiff established that some of these same companies were contacted by and placed job orders with plaintiff prior to Greenberg's initial contact. Greenberg explained that files relative to a particular company would lie dormant until an account executive contacted the company again.

Marjorie Krantz testified at the hearing and by way of affidavit that she has been an account executive with plaintiff for six years. It was plaintiff's policy to have all account executives participate in finding acceptable candidates for the job orders written by another account executive.

Krantz stated that she had personally worked with Hazen and Greenberg in placing candidates with clients which Hazen and Greenberg claim to be their personal clients. On many occasions, Krantz supplied the successful candidate for a Hazen or Greenberg job order for companies which Hazen and Greenberg claim to be their clients. Her duties during such placements included preparing the candidates for the interview, debriefing them afterwards, negotiating their salaries and terms of employment and preparing a job placement form upon acceptance. Krantz also had personal contact with many of Hazen's and Greenberg's claimed clients.

At the close of the evidence, the circuit court found that plaintiff failed to establish a protectable interest to justify enforcement of the restrictive covenants. The court believed that plaintiff's clients were more the product of the account executives' good luck and personal efforts on plaintiff's behalf rather than the product of plaintiff's good will and long-term relationship with the client. The court further be-

lieved that plaintiff's customer information was not sufficiently confidential to warrant protection. For these reasons, the court denied plaintiff's motion for preliminary injunctive relief and dissolved the temporary restraining order.

This appeal is taken from the denial of a preliminary injunction (see 134 Ill. 2d R. 307). A preliminary injunction is a provisional remedy granted to preserve the status quo, *i.e.*, the last, peaceable uncontested status which preceded the litigation, pending a hearing on the merits of the case. (*Label Printers v. Pflug* (1991), 206 Ill. App. 3d 483, 564 N.E.2d 1382; *The Instrumentalist Co. v. Band, Inc.* (1985), 134 Ill. App. 3d 884, 480 N.E.2d 1273; *Hydroaire, Inc. v. Sager* (1981), 98 Ill. App. 3d 758, 424 N.E.2d 719.) A party seeking a preliminary injunction must show: (1) he possesses a clear right or interest needing protection; (2) an inadequate remedy at law; (3) irreparable harm will result if it is not granted; and (4) there is a reasonable likelihood of success on the merits. *Tyler Enterprises of Elwood, Inc. v. Shafer* (1991), 214 Ill. App. 3d 145, 573 N.E.2d 863; *Millard Maintenance Service Co. v. Bernero* (1990), 207 Ill. App. 3d 736, 566 N.E.2d 379; *Preferred Meal Systems, Inc. v. Guse* (1990), 199 Ill. App. 3d 710, 557 N.E.2d 506; *Agrimerica, Inc. v. Mathes* (1988), 170 Ill. App. 3d 1025, 524 N.E.2d 947; *A.B. Dick Co. v. American Pro-Tech* (1987), 159 Ill. App. 3d 786, 514 N.E.2d 45.

The decision to grant or deny preliminary injunctive relief lies within the sound discretion of the trial court, and a reviewing court's role is limited to determining only whether the trial court abused that discretion. (*Hamer Holding Group, Inc. v. Elmore* (1990), 202 Ill. App. 3d 994, 560 N.E.2d 907.) In *Dixon Association for Retarded Citizens v. Thompson* (1982), 91 Ill. 2d 518, 524-25, 440 N.E.2d 117, 120, our supreme court quoting from *City of Chicago v. Airline Canteen Service, Inc.* (1978), 64 Ill. App. 3d 417, 432-33, 380 N.E.2d 1106, 1118, elaborated as follows on the applicable standard of review:

" 'It is well established that a hearing on a motion for a preliminary injunction does not determine any factual issue. A preliminary injunction is issued to preserve the *status quo* until the trial court may consider the merits of the case. In ruling on a motion for such relief, controverted facts or the merits of the case *are not decided.* In reviewing the discretion exercised by the trial court, an appellate court may decide only whether the petitioner had demonstrated a *prima facie* case that there is a fair question as to the existence of the rights claimed; that the circumstances lead to a reasonable belief that they probably will be entitled to the relief sought, if the evidence sustains the

allegations of the petition; and that matters should be kept in *status quo* until the case can be decided on its merits. In sum, the only question before us is whether there was sufficient showing to sustain the order of the trial court.' " (Emphasis in original.)

See also *Office Electronics, Inc. v. Adell* (1992), 228 Ill. App. 3d 814, 818-19; *Hamer Holding Group, Inc.*, 202 Ill. App. 3d 994, 560 N.E.2d 907; *Preferred Meal Systems, Inc. v. Guse* (1990), 199 Ill. App. 3d 710, 557 N.E.2d 506; *Witter v. Buchanan* (1985), 132 Ill. App. 3d 273, 476 N.E.2d 1123.

In the present case, plaintiff predicates its request for preliminary injunctive relief against defendants on the restrictive covenants contained in Hazen's and Greenberg's respective employment contracts and on the existence of trade secrets under the Act. We first address the covenants in question.

The propriety of injunctive relief relative to a restrictive covenant turns on the enforceability of that covenant, and this determination presents a question of law. (*E.g., Tyler Enterprises of Elwood, Inc. v. Shafer* (1991), 214 Ill. App. 3d 145, 573 N.E.2d 863; *Capsonic Group v. Swick* (1989), 181 Ill. App. 3d 988, 537 N.E.2d 1378; *Corroon & Black, Inc. v. Magner* (1986), 145 Ill. App. 3d 151, 494 N.E.2d 785; *The Instrumentalist Co. v. Band, Inc.* (1985), 134 Ill. App. 3d 884, 480 N.E.2d 1273; *Tower Oil & Technology Co. v. Buckley* (1981), 99 Ill. App. 3d 637, 425 N.E.2d 1060; *Image Supplies, Inc. v. Hilmert* (1979), 71 Ill. App. 3d 710, 390 N.E.2d 68.) Covenants not to compete are, in effect, restraints on trade and will be carefully scrutinized to ensure that their intended effect is not to prevent competition *per se.* (*E.g., Tyler Enterprises of Elwood, Inc.*, 214 Ill. App. 3d at 149, 573 N.E.2d at 865; *Capsonic Group*, 181 Ill. App. 3d at 992, 537 N.E.2d at 1382; *Corroon & Black*, 145 Ill. App. 3d at 162, 494 N.E.2d at 791; *The Instrumentalist Co.*, 134 Ill. App. 3d at 891, 480 N.E.2d at 1279; *Image Supplies, Inc.*, 71 Ill. App. 3d at 713, 390 N.E.2d at 70.) The basic test applied by Illinois courts in determining the enforceability of restrictive covenants is whether the terms of the agreement are reasonable and necessary to protect a legitimate business interest of the employer, a determination which necessarily turns on the facts and circumstances of each case. *Label Printers v. Pflug* (1991), 206 Ill. App. 3d 483, 491, 564 N.E.2d 1382, 1387; *Shapiro v. Regent Printing Co.* (1989), 192 Ill. App. 3d 1005, 1010, 549 N.E.2d 793, 795; *Southern Illinois Medical Business Associates v. Camillo* (1989), 190 Ill. App. 3d 664, 672, 546 N.E.2d 1059, 1064-65; *P C x Corp. v. Ross*

(1988), 168 Ill. App. 3d 1047, 1057, 522 N.E.2d 1333, 1339; *Corroon & Black*, 145 Ill. App. 3d at 162, 494 N.E.2d at 791.

■ Our courts have long recognized two situations in which an employer has a legitimate business interest to justify enforcement of a covenant not to compete: (1) where, "by the nature of the business, the customer relationship is near-permanent and but for [her] association with plaintiff, defendant would never have had contact with the clients in question"; and (2) where the former employee "acquired confidential information through his employment and subsequently attempted to use it for his own benefit." *Nationwide Advertising Service, Inc. v. Kolar* (1975), 28 Ill. App. 3d 671, 673, 329 N.E.2d 300, 302; see also *Label Printers*, 206 Ill. App. 3d 483, 564 N.E.2d 1382; *The Instrumentalist Co.*, 134 Ill. App. 3d 884, 480 N.E.2d 1273; *The Packaging House, Inc.*, 114 Ill. App. 3d 284, 448 N.E.2d 947; *Hayden's Sport Center, Inc. v. Johnson* (1982), 109 Ill. App. 3d 1140, 441 N.E.2d 927; *Morrison Metalweld Process Corp. v. Valent* (1981), 97 Ill. App. 3d 373, 422 N.E.2d 1034.

In this case, plaintiff alleges that the circuit court abused its discretion in finding that plaintiff failed to raise a *prima facie* case demonstrating a fair question that it had a protectable interest in its clients under either of the above situations. Upon our review of Illinois law and the record evidence, we believe the court acted within its discretion.

To support its argument that it established a near-permanent relationship with its clients, plaintiff directs this court to our decisions which have developed and applied a seven-factor test to determine whether a near-permanent relationship exists. (See *e.g.*, *Agrimerica, Inc.*, 170 Ill. App. 3d 1025, 524 N.E.2d 947; *A.B. Dick Co.*, 159 Ill. App. 3d 786, 514 N.E.2d 45; *McRand, Inc. v. Van Beelen* (1985), 138 Ill. App. 3d 1045, 486 N.E.2d 1306.) For each factor, plaintiff cites to record evidence to support the factor. Plaintiff thereafter argues that because evidence exists to support each factor, it has raised a fair question of near-permanency, thereby entitling it to preliminary injunctive relief.

In denying plaintiff relief under the near-permanency test, the circuit court believed the evidence did not support plaintiff's argument that it had a near-permanent relationship with its clientele. Rather, the court found that the key to plaintiff's success was more the good luck, timing and personality of the account executives, and not the customer data in plaintiff's files, its good will or the training imparted to its employees. Although the court was sympathetic with the amount of money plaintiff spent to develop its candidates and clients,

this sum of money did not change the lack of near permanency in plaintiff's relationship with its clients.

The near-permanency test has as its origin the supreme court cases of *Canfield v. Spear* (1969), 44 Ill. 2d 49, 254 N.E.2d 433, and *Cockerill v. Wilson* (1972), 51 Ill. 2d 179, 281 N.E.2d 648. In *Canfield*, defendants were a group of medical doctors practicing in Rockford, Illinois, who accepted the plaintiff, a dermatologist, into their association. Defendant had never lived in the Rockford area and brought no clients with him. Defendant executed a restrictive covenant upon his employment, which our supreme court enforced. In *Cockerill*, plaintiff and defendant were veterinarians who formed an association together. Plaintiff, an established veterinarian, employed the younger defendant and guaranteed him an annual salary. Defendant was a stranger to the area of practice and brought no clients with him. Our supreme court enforced a restrictive covenant against defendant to which he agreed upon beginning his association with plaintiff.

In *Nationwide Advertising Service, Inc. v. Kolar* (1973), 14 Ill. App. 3d 522, 528, 302 N.E.2d 734, 738, we observed of *Canfield* and *Cockerill*:

> "In both *Cockerill* and *Canfield* the defendants were brought into contact with clients upon which the plaintiffs in those cases had spent considerable time and effort to attract. The defendants, newcomers to the area of their practice, had contact with clients because of their association with the longer established plaintiffs. The very nature of the professions in which those plaintiffs were engaged indicates that they could justifiably anticipate a permanent or near-permanent relationship with their clientele. The defendants undoubtedly would never have had contact with these clients had it not been for their association with the plaintiffs. This is quite different from the nature of the customer contact in the personnel advertising business as it was described by Brauer [a competitor's vice-president]."

In the *Kolar* case, quoted above, plaintiff's business consisted of soliciting and placing in local newspapers recruitment advertisements for jobs or positions available in private industry. Defendant was plaintiff's regional manager upon his separation with plaintiff and thereafter a sales representative for one of plaintiff's competitors. Plaintiff sought preliminary injunctive relief against defendant to enforce the terms of a restrictive covenant. The evidence at the hearing showed the industry to be competitive; that it was no secret which

customers used which advertising company; that the nature of the industry was that 20% to 25% of a given year's business would not be repeated the following year; and that "[a] fair characterization of Brauer's testimony would be that as a general rule an advertising agency's relationship with its customers is transitory and not permanent." *Kolar*, 14 Ill. App. 3d at 525-26, 302 N.E.2d at 736.

■ The distinction which *Kolar* drew between the "nature of the business" in *Kolar* and in *Cockerill* and *Canfield* is evident throughout this State's case law on the subject. Generally, the near-permanency test turns in large degree on the nature of the business involved, and certain businesses are just more amenable to success under it. For example, plaintiffs engaged in a professional or psuedoprofessional practice enjoy a relatively high degree of success under the test (see *Frank B. Hall & Co. v. Payseur* (1979), 78 Ill. App. 3d 230, 396 N.E.2d 1246 (insurance brokerage); *Booth v. Greber* (1977), 48 Ill. App. 3d 213, 363 N.E.2d 6 (electrolysis); *Wolf & Co. v. Waldron* (1977), 51 Ill. App. 3d 239, 366 N.E.2d 603 (certified public accountants), as do plaintiffs who sell their customers a unique product or service (*Arpac Corp. v. Murray* (1992), 226 Ill. App. 3d 65, 589 N.E.2d 640 (manufacturer of sophisticated and complicated shrink or plastic wrap packaging machinery); *Agrimerica, Inc.*, 170 Ill. App. 3d 1025, 524 N.E.2d 947 (manufacturer and seller of flavoring ingredients, mold inhibitors and surfactants to large-scale animal feed producers); *A.B. Dick Co.*, 159 Ill. App. 3d 786, 514 N.E.2d 45 (maintenance and repair services for copiers, microfiche and offset printing equipment); *McRand, Inc.*, 138 Ill. App. 3d 1045, 486 N.E.2d 1306 (designing and coordinating management and incentive award programs for major corporations and business); *The Instrumentalist Co.*, 134 Ill. App. 3d 884, 480 N.E.2d 1273 (publisher of monthly magazine directed toward school band and orchestra directors and music teachers). Plaintiffs under contract with customers also achieve success under the test. See *A.B. Dick Co.*, 159 Ill. App. 3d 786, 514 N.E.2d 45 (customers signed one-year contract which renewed automatically unless cancelled); *J.D. Marshall International, Inc. v. Fradkin* (1980), 87 Ill. App. 3d 118, 409 N.E.2d 4 (exclusive exporter of domestic manufacturers).

On the other hand, where the nature of the plaintiff's business does not engender customer loyalty as with a unique product or personal service, and customers utilize many suppliers simultaneously to meet their needs, plaintiffs in such business achieve a lesser degree of success under the near-permanency test. (See *Label Printers v. Pflug* (1991), 206 Ill. App. 3d 483, 564 N.E.2d 1382; *Southern Illinois Medi-*

*cal Business Associates v. Camillo* (1989), 190 Ill. App. 3d 664, 546 N.E.2d 1059; *Reinhardt Printing Co. v. Feld* (1986), 142 Ill. App. 3d 9, 490 N.E.2d 1302; *Iroquois Industries Corp. v. Popik* (1980), 91 Ill. App. 3d 505, 415 N.E.2d 4.) The fact pattern typifying these latter cases is the existence of a highly competitive industry in which customers, through cross-purchasing, satisfy their buying needs. Plaintiffs in these businesses rely heavily on their sales force, who utilize basic sales techniques such as cold calls to make sales. The identity of customers or clients is known by all in the industry. We described in *Reinhardt* the nature of the business in these cases as follows:

> "[S]hort-term, impermanent customers whose business [the salesperson/defendant] was able to solicit not *because* of her association with plaintiff, but rather, through her own efforts on plaintiff's behalf and in furtherance of her association with it." (Emphasis in original.) *Reinhardt Printing Co.*, 142 Ill. App. 3d at 17, 490 N.E.2d at 1308.

■ The trial court's conclusion regarding the nature of plaintiff's business and the lack of permanency of its clientele is in accord with the above principles and the record evidence. This evidence shows plaintiff to supply qualified candidates to Chicagoland businesses having office support personnel openings. Businesses likely to have such needs are not secret; rather, their names, addresses and nature of business are readily available to all in the industry by way of canvassing, cold calling and the use of telephone and specialized directories. Information about the company, personnel openings, rate of pay, and qualifications required is only a telephone call away. These businesses do not fill their hiring needs from one placement agency; rather, they pay a fee to the agency which supplied the accepted candidate. Plaintiff may not be this agency every time. Based on the record evidence, the court's findings regarding the nature of plaintiff's business, and plaintiff's failure to meet the near-permanency test, were within the court's discretion.

■ We reach the same result even if we were to apply the seven-factor test which this court has developed and which plaintiff urges us to apply. Summarily, these factors are: (1) the number of years required to develop the clientele; (2) the amount of money invested to acquire clients; (3) the degree of difficulty in acquiring clients; (4) the extent to personal customer contact by the employee; (5) the extent of the employer's knowledge of its clients; (6) the duration of the customers' association with the employer; and (7) the continuity of employer-customer relationships. *Agrimerica, Inc.*, 170 Ill. App. 3d 1025,

524 N.E.2d 947; *A.B. Dick Co.*, 159 Ill. App. 3d 786, 514 N.E.2d 45; *McRand, Inc.*, 138 Ill. App. 3d 1045, 486 N.E.2d 1306.

■ While the first and third factor can be viewed to weigh in plaintiff's favor, as the evidence reflects that an initial and any subsequent placements require time and effort, the evidence on the other factors does not support plaintiff's case. The most telling of these are the last two factors, duration and continuity.

In its brief, plaintiff directs this court to the evidence that approximately 50% of its clients use plaintiff's services for multiple placements and that one-third of its clients have been plaintiff's clients for three years or longer. By plaintiff's own evidence, approximately 50% of its clients never return and two-thirds have less than a three-year relationship with plaintiff. Although our cases do not require a customer relationship to be both long-term and exclusive or that plaintiff show near permanency with each customer (*Preferred Meal Systems, Inc. v. Guse* (1990), 199 Ill. App. 3d 710, 723-24, 557 N.E.2d 506, 514), our cases require more than that shown by plaintiff. See *Millard Maintenance Service Co. v. Bernero* (1990), 207 Ill. App. 3d 736, 566 N.E.2d 379 (four of Millard's customers were clients in excess of 15 years; Millard's seven largest customers composed 70% of its business); *Preferred Meal Systems, Inc.*, 199 Ill. App. 3d at 723-24 (70% of business received from only 20 customers; of 120 customers, 55 have been clients since Preferred opened in the 1970's and over 85 have been customers in excess of five years); *Agrimerica, Inc.*, 170 Ill. App. 3d 1025, 524 N.E.2d 947 (several customers had relationship in excess of 30 years; 75% of sales to customers in excess of five years); *The Instrumentalist Co.*, 134 Ill. App. 3d 884, 480 N.E.2d 1273 (majority of plaintiff's top advertisers have advertised for at least 15 years); *McRand, Inc.*, 138 Ill. App. 3d 1045, 486 N.E.2d 1306 (McRand's major customers went to it on regular basis, not a "one-shot" deal).

Relative to these same two factors, we are further directed by plaintiff to the evidence that Household International accepted placements from plaintiff 24 times between May 1989 and August 1990. Other documentary evidence shows that many companies submit job orders to plaintiff on a regular basis.

We are not persuaded that this evidence evinces an abuse of discretion. Plaintiff's president testified on cross-examination that Household International first paid a fee to plaintiff because of defendant Greenberg's efforts on plaintiff's behalf. Prior to this time, Household International was only a prospect. Regarding companies submitting job orders on a regular basis, near permanency is not established

merely by accepting job orders for goods or services on a regular basis; rather, filling those orders is what counts under the test.

■ Plaintiff also emphasizes the second factor to this court, namely, how much money it spends to attract clients. The evidence reflects, however, that much of plaintiff's expenditures are for advertisements for candidates, not clients. Similarly, plaintiff's other big-ticket expenditure, account executive training, is not directly spent on any one client in particular. Finally, although plaintiff takes its clients out to lunch, sends gifts and cards, and produces brochures of its services, these funds are insufficient to render permanent that which is not. See *Preferred Meal Systems*, 199 Ill. App. 3d 710, 557 N.E.2d 506 ($1 million/year spent to develop clients and service existing ones); *Agrimerica, Inc.*, 170 Ill. App. 3d 1025, 524 N.E.2d 947 ($300,000 spent in 1985 for research to attract customers; $400,000 in 1986); *McRand, Inc.*, 138 Ill. App. 3d 1045, 486 N.E.2d 1306 ($200,000 to develop first sale to customer).

■ In summary, the circuit court acted within its discretion when it determined that plaintiff failed to raise a fair question demonstrating a near-permanent relationship with its clients. In light of our conclusion, we need not address whether plaintiff raised a fair question that, but for her employment with plaintiff, neither Hazen nor Greenberg would have had contact with plaintiff's clients.

Having affirmed the circuit court relative to the near-permanency test, we must nevertheless address whether plaintiff has a proprietary interest in its customers on the independent ground that during Hazen's and Greenberg's employ, they acquired confidential information and are now attempting to use it for their own benefit. With respect to enforcement of restrictive covenants on this ground, we have specifically rejected the notion that " 'only trade secrets—as distinct from confidential information—are entitled to legal protection.' " (*Millard Maintenance Service Co.*, 207 Ill. App. 3d at 746, 566 N.E.2d at 385, quoting *Shapiro v. Regent Printing Co.*, 192 Ill. App. 3d at 1011.) A restrictive covenant will be enforced " 'where the former employee learned trade secrets *or acquired* other *confidential information while in plaintiff's employ and subsequently attempted to use it for his or her own benefit* [citation].' " (Emphasis in original.) *Millard Maintenance Service Co.*, 207 Ill. App. 3d at 746, 566 N.E.2d at 385, quoting *Shapiro*, 192 Ill. App. 3d at 1011.

■ In Illinois, customer lists and other customer information will be deemed a protectable trade secret only where the information has been developed by the employer over a number of years at great expense and kept under tight security. However, the same type of infor-

mation is not protectable where it has not been treated as confidential and secret by the employer, was generally available to other employees and known by persons in the trade, could be easily duplicated by reference to telephone directories or industry publications, and where the customers on such lists did business with more than one company or otherwise changed businesses frequently so that their identities were known to the employer's competitors. (*Reinhardt Printing Co.*, 142 Ill. App. 3d at 1148, 490 N.E.2d at 1309 (and cases cited therein).) The protection afforded under the Illinois Trade Secrets Act (Ill. Rev. Stat. 1989, ch. 140, par. 351 *et seq.*) is in accord with these principles. See *Carbonic Fire Extinguishers, Inc. v. Heath* (1989), 190 Ill. App. 3d 948, 952, 547 N.E.2d 675, 677 ("The focus of the Act and the common law is on the secrecy of the information sought to be protected").

In this case, plaintiff's claimed confidential information encompasses three categories: (1) candidate information; (2) client information; and (3) a list of clients which have actually paid plaintiff a fee.

■ Regarding plaintiff's candidate information, plaintiff directs this court to the evidence that Hazen and Greenberg, during their employment, had exposure to candidate information compiled in candidate application forms. Plaintiff, however, presented no evidence that any of the defendants have contacted plaintiff's candidates or are otherwise using the candidate information in competition with plaintiff. Accordingly, the court acted within its discretion relative to this information.

Regarding plaintiff's client information, plaintiff details this information as follows: the client's name, address and key contact person; the client's benefit package; type of word-processing equipment used; its products and services; number of employees; fee the client is willing to pay for placement; and history of placements.

We again believe the circuit court properly exercised its discretion with respect to this information. The court could properly find that the above information was readily available to anyone in the business capable of canvassing or finding a directory, whether it be the Yellow Pages or a specialized directory, placing a cold call to that business, and asking specific questions designed to elicit the information above. Indeed, it was the account executives in this case who developed most of the information in question. (*I L G Industries, Inc. v. Scott* (1971), 49 Ill. 2d 88, 93-94, 273 N.E.2d 393, 396 ("One who has worked in a particular field cannot be compelled to erase from his mind all of the general skills, knowledge and expertise acquired through his experience").) Further, our cases have found that where customer informa-

tion is readily available to competitors through normal competitive means, no protectable interest exists. Compare *Donald McElroy, Inc. v. Delaney* (1979), 72 Ill. App. 3d 285, 389 N.E.2d 1300 (protectable interest found where plaintiff business was recovering silver from other business' photographic materials, and where employee was exposed to plaintiff's recovery equipment capabilities, yield figures and bid calculation methodology); *Tower Oil & Technology Co. v. Buckley* (1981), 99 Ill. App. 3d 637, 425 N.E.2d 1060 (protectable interest found in technological data concerning lubrication business and past customer needs), with *Hayden's Sport Center, Inc. v. Johnson* (1982), 109 Ill. App. 3d 1140, 441 N.E.2d 927 (no protectable interest in information pertaining to sporting goods customers' buying habits where such information was relatively more generalized and easy to ascertain); *Image Supplies, Inc. v. Hilmert* (1979), 71 Ill. App. 3d 710, 390 N.E.2d 68 (no protectable interest exists relative to customer information readily available to competitors or in public sources).

Finally, as for plaintiff's customer list, which includes the name of clients having paid a fee to plaintiff, the court did not abuse its discretion in finding that plaintiff had no protectable interest in the list. The record shows that Chicagoland businesses in need of office support personnel can be ascertained quite readily by canvassing and using various directories. In *Carbonic Fire Extinguishers, Inc. v. Heath* (1989), 190 Ill. App. 3d 948, 953, 547 N.E.2d 675, 677-78, a case arising under the Act, we recently commented on similar evidence:

> "[H]ere, plaintiff is engaged in the restaurant-hood-cleaning business, a service commonly utilized by restaurants. As such, *although the actual customers using plaintiff's services are not readily apparent from the telephone directory,* anyone seeking to compete with plaintiff, including defendant, could very likely encounter plaintiff's customers by simply contacting restaurants through the telephone directory. Thus, plaintiff has failed to establish the secrecy of the customer list. Further, other persons would not obtain economic value from disclosure or use of plaintiff's customer list as identification of potential customers who might use a restaurant-hood-cleaning service would entail little, if any, expense beyond that ordinarily required to establish a customer relationship. [Citation.] Consequently, plaintiff has not shown that its customer list is sufficiently secret to derive economic value from not being generally known to other persons who could obtain economic value from its disclosure or use." (Emphasis added.)

While plaintiff in this case seeks to distinguish *Carbonic Fire Extinguishers* on the ground that all the businesses there were restaurants, whereas in this case many different businesses have office support personnel needs, we believe this distinction ignores the evidence common to both cases, namely, the relative ease with which plaintiff's clients can be ascertained.

*Gillis Associated Industries, Inc. v. Cari-All, Inc.* (1990), 206 Ill. App. 3d 184, 564 N.E.2d 881, a case upon which plaintiff heavily relies, is distinguishable. In *Gillis*, plaintiff was the exclusive distributor of defendant's wire shelving products for the United States. The parties were under contract for six years. During this period, plaintiff developed a customer list containing the names of over 3,000 customers across the entire nation who had purchased the wire shelving product. In its complaint, plaintiff alleged that its prior employee had misappropriated the customer list and was using it in competition with plaintiff as an employee of defendant.

In this case, plaintiff has not shown that Hazen and Greenberg took its customer list and are now using it to compete against plaintiff. Also, plaintiff's list in this case is much shorter, and covers companies having a more general need, all of which can be found in local public directories or through canvassing.

Also distinguishable is *Courtesy Temporary Service, Inc. v. Camacho* (1990), 222 Cal. App. 3d 1278, 272 Cal. Rptr. 352, another case upon which plaintiff relies. In *Camacho*, plaintiff was engaged in the temporary employment business since 1969, providing temporary workers to various companies. Defendants there admitted scheming while employed by plaintiff to form a competitive business. Their conduct evinced an extreme disregard of fiduciary duty, including their admissions that they compiled a list of plaintiff's major customers while still employed by plaintiff, and handing plaintiff's other employees letters intending to misrepresent that plaintiff was relocating to the address of defendants' new company or was being taken over by the defendants. No evidence of such extreme scheming exists in this case.

For the foregoing reasons, the order of the circuit court of Cook County denying plaintiff preliminary injunctive relief and dissolving the temporary restraining order is affirmed.

Affirmed.

CAMPBELL and O'CONNOR, JJ., concur.