A.J. DRALLE, INC., Plaintiff-Appellee, v. AIR TECHNOLOGIES, INC., Defendant-Appellant.

Second District   No. 2—93—0566

Opinion filed January 14, 1994.—Rehearing denied February 23, 1994.

Thomas R. Weiler and Roger K. O'Reilly, both of O'Reilly, Cunningham, Norton & Mancini, of Wheaton, for appellant.

Nancy A. McKeating, of Schwartz & Freeman, of Oakbrook Terrace, for appellee.

JUSTICE COLWELL delivered the opinion of the court:

Defendant, Air Technologies, Inc. (ATI), brings this interlocutory appeal from an order of the circuit court of Du Page County granting the issuance of a preliminary injunction preventing ATI from contacting any customers of plaintiff, A.J. Dralle, Inc. (Dralle). The order also restricts prices on products sold by ATI to those Dralle customers that directly contact ATI. We reverse.

ATI is a Kansas corporation that manufactures paint over-spray filters and other air filter products. Keith Gutreuter (Keith) is president of ATI and his wife, Sharon, is vice-president of sales and marketing. Dralle, an Illinois corporation, previously acted as distributor of ATI products. James Dralle (James) is president of Dralle.

Keith met James in 1978 when Keith was the national sales manager for Glassfloss Industries. James' company at that time, Valley Environmental, acted as the distributor of products manufactured by Glassfloss. In 1987, Keith and Sharon started up ATI with James and James' wife, Ann. The Gutreuters owned 51% of ATI stock and the Dralles owned 49%. Dralle acted as distributor of ATI products. Initially, no written distributorship agreement existed between the two companies.

The Gutreuters and the Dralles began discussing the expansion of ATI facilities in 1990. The Gutreuters suggested expansion through the use of industrial revenue bonds during a board meeting in April 1992. James and his wife did not approve of the industrial revenue bond proposal. As a result of their disagreements, the parties began discussion of ATI's purchase of the Dralles' stock pursuant to a stock agreement. The closing date for the bond issue was June 23, 1992; however, the stock purchase agreement had not been finalized by that date.

James also proposed drafting a distributorship agreement (Agreement) between Dralle and ATI. Since the terms had not been finalized by June 23, the parties signed a memorandum of agreement. The Agreement was finally signed in September 1992 and gave Dralle the exclusive right to sell ATI products in Illinois, Wisconsin, and Indiana for a four-year period.

ATI learned in the fall of 1992 that Dralle had allegedly begun selling products which competed with ATI products. ATI sent a letter to Dralle on December 9, 1992, requesting that the Agreement be ter-

minated. ATI brought in a new salesman in February 1993 to sell ATI's products in the territory previously held by Dralle.

Dralle filed a complaint for injunction and other relief on March 12, 1993, alleging that ATI, through its agents and employees, had approached and solicited persons and companies known by ATI to be long-time customers of Dralle. Dralle alleged that ATI utilized Dralle's business information in connection with its solicitation of Dralle clients in violation of the Agreement. The trial court conducted an evidentiary hearing commencing on March 23, 1993.

Dralle submitted as evidence a list entitled "A.J. Dralle's 1992 Customers" and a second list entitled "A.J. Dralle Drop Ship Customers By 1992 Sales Volume." Keith Gutreuter testified that he never made a list of Dralle customers after June 23, 1992, the date the Dralles resigned from ATI. Keith denied that he or anyone at ATI developed a strategy to target sales to Dralle customers. He denied performing an analysis of Dralle accounts or gathering Dralle data regarding the pricing of products to enable ATI to sell at a lower price than Dralle. He also denied telling anyone he intended to solicit Dralle clients. Sharon's testimony basically corroborated that of her husband.

Keith testified that he noticed in September 1992 that orders placed through ATI a few months earlier were being cancelled. He called James to inquire about the orders but James never got back to him. Keith also noticed a substantial drop in ATI sales from August through September 1992. James never responded to Keith's inquiry as to the drop in sales. Keith later learned that Dralle was manufacturing and selling filters other than ATI filters.

Rex Franklin Powell testified that he had been employed as a general manager at ATI from January 1992 until he was fired on January 8, 1993. Powell said he attended an executive planning meeting at ATI on December 16, 1992, where he presented to the Gutreuters a document outlining initiatives to ensure ATI's survival. He testified that one of the sales initiatives discussed was ATI's "overarching strategy to move into certain markets that A.J. Dralle, Inc., dominated." Powell stated that the Gutreuters talked about this strategy numerous times and had put the plan together over a period of weeks. Keith discussed putting together a list of Dralle accounts by sales volume and using people in the industry to approach these accounts. Keith also talked about pricing strategies to undersell the Dralle account in certain marketing areas. Keith told Powell he was able to get a concession from ATI's supplier, Cumulus Fibers, in order to reduce ATI's cost and still make a profit.

Powell testified that Keith wanted to use third parties to target Dralle accounts as a low-risk approach because the Gutreuters feared the threat of litigation. Keith wanted to be very careful about acquiring Dralle accounts because of the Agreement between ATI and Dralle. Powell testified that Keith wanted to develop a business relationship with Terry Rueckert, a sales representative for Dralle, because Rueckert had a firm grip on A.J. Dralle customers. Keith also wanted to develop a relationship with Chuck Rankin, owner of Air Filter Engineers and a competitor of ATI, in order to expand ATI sales in the Dralle territory.

Powell said he had reviewed Dralle accounts and put them in a sales volume listing prior to the December 16, 1992, meeting in order to determine the most valuable accounts. He wrote the information in a handwritten document. Powell testified that, during the December 16 meeting, the parties decided that a Dralle customer list would be put together. Powell and Sharon instructed Wanda Gavel, a sales clerk, on putting together the list. Powell said the list was completed about a week after the meeting and included the identity of the Dralle client companies, their locations, and sales dollar volume of the top 20 Dralle accounts, taken from a three-month sampling of sales orders.

Powell stated that Sharon also put together an itinerary outlining the sales contacts on various Dralle accounts which were to have been made in January 1993 and the following months. The list had a strong correlation with the list of the 20 most lucrative Dralle accounts. Powell said he had never seen the lists entitled A.J. Dralle's 1992 customers and A.J. Dralle Drop Ship Customers by 1992 Sales Volume, submitted as exhibits 20 and 21 at the hearing.

Powell testified that ATI changed its policy on delivery of Dralle products after June 23, 1992, as part of its strategy to harm Dralle. He said that ATI had previously tried to produce products for Dralle delivery in the shortest possible time, but Keith later directed that the policy be changed so that Dralle shipments were not sent until the end of about a two-week period.

Powell admitted that he had been fired from ATI. He also admitted he did not have his MBA, although his resume so stated, and that his prior work experience on his resume was inaccurate. Powell admitted he had no personal knowledge of ATI using a list of Dralle customers in order to target Dralle accounts.

Douglas Wood, the ATI sales representative who replaced Dralle, testified that he had been brought in from another territory to sell ATI products in Illinois in February 1993. Wood said that he had been working in his new area for ATI for about two months at the time of

the hearing. During this period he had made about 100 sales calls, 3 of which were Dralle customers. Wood said he typically would cold call manufacturers after locating their names under headings such as "Paint Services" in the Harris Industrial Guide or the yellow pages. He also received leads for potential clients through personal contacts from his previous experience in the industry.

Wood was questioned about a sales meeting he had with Acme Finishing Company, Inc. (Acme). Wood said he was unaware that Acme was a former or present customer of Dralle until he made a call on Acme. He had contacted Acme by cold calling. Wood was told he could use any sales techniques as long as he used his own sources to find prospects. Wood was told that the only restriction was that he could not have a list of Dralle customers.

Wood testified that Keith and Sharon directed him to contact a previous Dralle client, Ingersoll Milling, in Rockford, Illinois. On the same day, he contacted Sunstrand and Reed Chatwood, two other current Dralle clients in Rockford. Wood did not know at the time they were Dralle clients.

Terry Rueckert, a Dralle sales representative and sales manager, testified that Keith called him on December 24, 1992, and asked if Rueckert had a noncompete agreement with Dralle. Keith told Rueckert that ATI was going after Dralle clients but would not go after Rueckert's territory right away. Rueckert began selling Dralle products similar to ATI products in the fall of 1992. He said Dralle was in trouble on some accounts because Chuck Rankin, owner of Air Filter Engineers, was undercutting Dralle's prices. James instructed Rueckert to sell Dralle products because of Rankin's low prices. Rueckert said he sold his last truckload of ATI products at the end of December 1992.

James Dralle testified that, during his relationship with ATI, Dralle would receive a purchase order at its office. Dralle would send the purchase order to ATI containing a drop ship location. ATI manufactured the products and sent them directly to Dralle's customers. ATI would then bill Dralle.

James testified that ATI's product was unique in 1987 but has several competitors today. James said that ATI's products had been priced without allowing for Dralle's distribution costs; therefore, he was having difficulty pricing the products to be competitive in the marketplace. James testified in March 1993 that he spoke with Bill Calhoun, the paint engineer at Cummins Engine Company (Cummins), a client of Dralle. He told Calhoun that ATI must have gotten lower pricing from a supplier and had tried to lower its prices to embarrass

Dralle. James stopped buying ATI products starting late in the summer of 1992 because of pricing pressures from competitors who were selling products at about the same price as Dralle's cost from ATI. James said that Dralle had also experienced some problems with the ATI products.

James testified that Dralle began manufacturing filters at the end of September or October 1992. He had already sold non-ATI products in August 1992, which was permissible under the distributorship agreement. James said the Dralle products were only sold in the places Dralle had lost business or was going to lose business because of pricing. James testified that, to his knowledge, Dralle had never provided a list of drop ship customers to ATI. He admitted that the products could not be shipped unless ATI had a list of Dralle customers.

Clark Stanard, president of CSE, Inc., testified that he acted as a distributor for ATI from fall 1992 until January 1993. He and Keith solicited business from Cummins, a Dralle client, in January 1993. Stanard admitted he paid ATI truckload price per square foot for materials he sold to Cummins when his sale to Cummins was less than a truckload and should have been at a higher price.

Keith Gutreuter was recalled and testified that ATI's computer did not have the capability of generating a list of Dralle drop ship customers by itself. He denied ever seeing the lists of Dralle clients in exhibits 20 and 21 prior to the first day of his testimony in this lawsuit. Keith had previously testified that "we never used the list of Dralle clients, never given to anybody or anyone has [sic] seen it other than myself or a couple of people at ATI." He again denied ever having a strategy to take Dralle customers. Keith said he only became aware of the list when he requested that his office print out everything having to do with Dralle pursuant to a discovery request. Keith said Wanda Gavel told him that she put the list together after going through invoices at Powell's direction. Keith said that Wanda had, like all ATI employees, signed off on a confidentiality statement, but that she had not informed him about the lists.

Powell stated on rebuttal that Keith told him at the December 16 meeting about the plan to exchange information on Dralle accounts with Chuck Rankin. Keith allegedly said that even if ATI did not get sales from the Dralle organization Rankin would do so and that would damage the integrity and profitability of Dralle. Powell testified that Keith believed he could always just use the Dralle customer list and claim it was industry knowledge.

At the close of the evidence, the trial court noted that this case was *sui generis* since no other cases had been found which dealt with vendee restraints in a business situation. The court found that ATI had committed acts of competition and had contacted Dralle customers in violation of the Agreement. The court entered a preliminary injunction which prohibited ATI from having any contact with Dralle clients. The trial court noted that the Agreement was an arm's length transaction with no unequal bargaining power. However, the court determined that it was necessary to insert a reasonable time frame in the preliminary injunction, given the public policy favoring competition. The court concluded that six months was a reasonable time to restrain ATI's competition and to allow Dralle to have the benefits of what was bargained for in the Agreement. ATI was allowed to sell products to Dralle customers who contacted ATI directly, but the court restricted the price at which ATI could sell its product to those customers. It is from this order that ATI appeals.

A reviewing court will not reverse a trial court's decision to grant or deny a preliminary injunction absent a clear abuse of discretion. (*Reinhardt Printing Co. v. Feld* (1986), 142 Ill. App. 3d 9, 15.) A preliminary injunction is an extraordinary remedy which is only to be used where an extreme emergency exists and serious harm would result without the injunction. (*Label Printers v. Pflug* (1991), 206 Ill. App. 3d 483, 490.) However, the purpose of a preliminary injunction is to preserve the status quo pending a decision on the merits; therefore, a plaintiff does not carry the same burden of proof that is required to prevail on the ultimate issue. (*Buzz Barton & Associates, Inc. v. Giannone* (1985), 108 Ill. 2d 373, 386.) The reviewing court may only decide whether the plaintiff has demonstrated a *prima facie* case that there is a fair question as to the existence of the rights claimed, that the circumstances lead to a reasonable belief that the plaintiff probably will be entitled to the relief sought, and that the matters should be kept in status quo until the case can be decided on the merits. (*Office Mates 5, North Shore, Inc. v. Hazen* (1992), 234 Ill. App. 3d 557, 568.) In sum, the only question before this court is whether there was a sufficient showing to sustain the order of the trial court.

■ To obtain a preliminary injunction, a party must establish that (1) it possesses a clearly ascertained right in need of protection; (2) it will suffer irreparable injury without the injunction; (3) there is no adequate remedy at law; and (4) there is a likelihood of success on the merits. (*LSBZ, Inc. v. Brokis* (1992), 237 Ill. App. 3d 415, 425.) In addition, the trial court must conclude that the balance of hardships

to the parties supports the grant of preliminary relief. *Armstrong v. Crystal Lake Park District* (1985), 139 Ill. App. 3d 991, 996.

ATI first argues that the trial court erred in construing the Agreement to prohibit ATI from competing or attempting any contact with Dralle customers. Paragraph 6(4) of the Agreement provides:

"(4) In the event of termination (or at the end of the term of this Agreement, if it is not sooner terminated), Manufacturer and Distributor will be free from future obligations under this Agreement. Distributor will not be relieved, however, of any obligations for unpaid balances for goods shipped hereunder prior to termination or expiration. Distributor shall retain as its sole and exclusive property any individual customers or names of Distributor's lists of customers developed prior to the date of this Agreement or developed in the performance of its obligations under this Agreement. Manufacturer acknowledges that the individual names of Distributor's customers and that the list of Distributor's customers as it may exist from time to time is a valuable, special and unique asset of Distributor's business and has only been disclosed by Distributor to allow shipment of the Products hereunder. Manufacturer agrees that it will not, during the term of this Agreement or thereafter, make use of, knowingly divulge or otherwise disclose, directly or indirectly, any trade or business secret, including, without limitation, any individual names of Distributor's customers, any customer list, data, records, financial information or program method or technique constituting a trade or business secret, concerning the business or policies of Distributor which it may have learned as a result of its relationship with Distributor except to the extent such use or disclosure is necessary to the performance of this Agreement and in furtherance of Distributor's best interest."

The trial court found that the clear meaning of paragraph 6(4) is that Dralle (Distributor) retains its customers as its property and that ATI (Manufacturer) will not compete.

ATI argues that the trial court improperly transformed a restriction on ATI's use of Dralle customer information into a covenant not to compete with Dralle. ATI admits that the Agreement prohibits ATI from using Dralle customer information to identify and locate companies to contact for sales. However, ATI maintains the Agreement does not prohibit contact with Dralle customers if those customers are identified and contacted by ATI independent of the Dralle customer list or customer information. ATI states in its appellate brief that it does not deny contacting Dralle customers or competing with Dralle.

ATI does deny using Dralle customer information to contact such customers.

We note that the clear language of the Agreement prohibits ATI's use of the customer list for any purpose other than shipping products out from ATI. The Agreement states that Dralle's customer list is "a valuable, special and unique asset" of Dralle's business and that ATI will not make use of this list, except as necessary for performance under the Agreement. The evidence indicated that ATI initiated a strategy to target Dralle customers by using the customer list in ATI's possession. However, this fact alone is not determinative of the instant case. Rather, we must first determine whether the Dralle customer list constituted a *clear legal* and protectible interest as required for the issuance of a preliminary injunction. The testimony revealed that eight current and former Dralle clients had been approached by ATI. The Gutreuters claim that any contacts made by ATI to Dralle clients were achieved through independent sources and were done innocently. They also argue that some of the companies approached ATI without any solicitation by ATI. Therefore, we must determine whether the Agreement, which precludes ATI from contacting Dralle clients in any fashion, is either enforceable or is an unacceptable restriction on trade and free competition.

Although the case at hand is unique on its facts, we find the analysis contained in restrictive covenant cases to be of some assistance in determining the issues involved. As in restrictive covenant cases, the propriety of injunctive relief here turns on the enforceability of the covenant, the Agreement, and this determination presents a question of law. (*Office Mates 5*, 234 Ill. App. 3d at 568.) Such covenants are, effectively, restraints on trade and should be carefully scrutinized to ensure that their intended effect is not to prevent competition *per se*. (*Office Mates 5*, 234 Ill. App. 3d at 568.) The test applied by Illinois courts to determine the enforceability of restrictive covenants is whether the terms of the agreement are reasonable and necessary to protect a legitimate business interest of the plaintiff, a determination which necessarily turns on the facts and circumstances of each case. *Label Printers*, 206 Ill. App. 3d at 491.

■ Our courts will enforce a restrictive covenant under two types of circumstances: (1) where the former employee acquired confidential information through employment and subsequently attempted to use it for his own gains, or (2) where, by nature of the business, the customer relationship is near permanent and, but for his association with plaintiff, defendant would not have had contact with the customers in question. (*Springfield Rare Coin Galleries, Inc. v. Mileham* (1993),

250 Ill. App. 3d 922, 935.) Unlike the˙ typical restrictive covenant cases where an employer seeks to enforce such an agreement with a former employee, the plaintiff here was a vendee who wished to restrain the vendor's use of its customer list and customer information through their Agreement. Nonetheless, a similar analysis is helpful to determine whether the customer list was confidential information and constituted a protectible interest as provided in the Agreement.

Illinois courts have determined that customer lists and other customer information will constitute confidential information only when the information has been developed by the plaintiff over a number of years at great expense and kept under tight security. (*Springfield Rare Coin Galleries, Inc.*, 250 Ill. App. 3d at 930.) Such information is not protectible where it has not been treated as confidential and secret by the plaintiff, was generally available to other of plaintiff's employees and known by persons in the trade, could easily be duplicated by reference to telephone directories or industry publications, and where the identity of plaintiff's customers was known to the plaintiff's competitors because the customers did business with more than one company or otherwise changed businesses frequently. See *Office Mates 5*, 234 Ill. App. 3d at 574-75.

■ The evidence in the present case showed that Dralle's customers were known to others in the trade and could be easily ascertained by reference to telephone directories and trade journals. Douglas Wood testified that he contacted potential clients by consulting the Harris Industrial Guide for Illinois, other trade directories, the yellow pages, or through his own personal contacts. In doing so, he said he unknowingly contacted Dralle clients. His testimony indicates that information about Dralle customers was readily available to anyone in the air filter business capable of canvassing or finding a directory, placing a cold call to that business, and making inquiries designed to elicit the information needed to pursue the company as a customer. Where customer information is readily available to competitors through such normal competitive means, no protectible interest exists. *Office Mates 5*, 234 Ill. App. 3d at 576.

In *Carbonic Fire Extinguishers, Inc. v. Heath* (1989), 190 Ill. App. 3d 948, the plaintiff sought relief under the Illinois Trade Secrets Act (765 ILCS 1065/1 *et seq.* (West 1992)). The plaintiff there was engaged in the restaurant-hood-cleaning business, a service commonly utilized by restaurants. This court determined that the plaintiff failed to establish the secrecy of its customer list and commented that "although the actual customers using plaintiff's services are not readily apparent from the telephone directory, anyone seeking to compete

with plaintiff, including defendant, could very likely encounter plaintiff's customers by simply contacting restaurants through the telephone directory." (*Carbonic Fire Extinguishers*, 190 Ill. App. 3d at 953.) This court determined that the customer list did not constitute a trade secret; therefore, the plaintiff failed to show the existence of a protectible interest and the issuance of the preliminary injunction was improper. (*Carbonic Fire Extinguishers*, 190 Ill. App. 3d at 954.) Although the instant case was not instituted under the Illinois Trade Secrets Act, we similarly conclude that there was no protectible interest here since the salesmen in the air filter industry could contact Dralle customers by using resources typical to the industry. In fact, the evidence indicated that Chuck Rankin of Air Filter Engineers had aggressively pursued Dralle and ATI customers in the air filter market. Given the relative ease with which Dralle's clients could be ascertained here, we believe the trial court abused its discretion in finding that Dralle had a protectible interest in the list.

■ We also conclude that Dralle has not shown that its customer relationships are near permanent such that the trial court should enforce the terms of the Agreement under a restrictive covenant analysis. A near-permanent relationship with customers is generally absent from businesses engaged in sales. (*Springfield Rare Coin Galleries, Inc.*, 250 Ill. App. 3d at 935.) Moreover, "[w]hen the employer's business is sales of a nonunique product, its customers also do business with its competitors, are generally known to the competitors, or are ascertainable by reference to telephone or specialized directories, the near-permanency test will not be satisfied." *Springfield Rare Coin Galleries, Inc.*, 250 Ill. App. 3d at 936.

The testimony at the hearing indicated that eight of the companies on Dralle's customer list were contacted by ATI, its agents and employees. These included Acme, Sundstrand, Reed Chatwood, Allsteel-Aurora, Cummins, Watertown Metals, Menasha, and Trek. The evidence showed that Allsteel and Watertown Metals were no longer Dralle clients and had transferred their business to Chuck Rankin's company, Air Filter Engineers.

James testified that he may spend up to five years obtaining a client and his relationship with the customer allows him to maintain an account for a long time. However, he admitted that air filter products were no longer unique and that several competitors had entered the market. In addition, three companies on the Dralle customer list, Flink Company, Ingersoll Milling, and Ford Electronic and Refrigeration, had contacted ATI directly regarding purchasing ATI filters without any solicitation by ATI. Given the evidence of these changes

in the customer relationships, we conclude that Dralle has not shown a near-permanent relationship with its customers or a protectible interest in the customer list.

ATI also contends that the trial court abused its discretion in imposing restrictions on the price for which ATI could sell its product to those customers of Dralle who contact ATI directly. The Agreement provided that ATI could not make use of or divulge any Dralle business information which it may have learned as a result of its relationship with Dralle. Dralle had accused ATI of using Dralle price information in order to solicit actively Dralle clients by offering to them products at a price Dralle could not match in the marketplace.

■ We conclude that Dralle failed to demonstrate that ATI possessed confidential pricing information as to what Dralle charges for its filter products. (See *Label Printers*, 206 Ill. App. 3d at 496.) In *Label Printers*, this court rejected an argument that pricing information was confidential since the only information that defendant possessed in regard to pricing was the price plaintiff directed defendant to quote to customers. The court concluded that this information could be readily ascertained by any competitor since the evidence showed that many customers would tell a salesperson the prices being quoted by a competitor. (*Label Printers*, 206 Ill. App. 3d at 496.) Thus, defendant had not acquired any confidential information during his employment with plaintiff which was not already known to plaintiff's competitors or which could not be easily ascertained by them. (*Label Printers*, 206 Ill. App. 3d at 497.) Here, the evidence at the hearing indicated that air filter salesmen were typically aware of what competitors charged for filter products. James admitted that ATI knew Dralle's costs since ATI knew what it charged Dralle for filter products and, with that information, "anybody could figure out" what prices Dralle charged its customers. Accordingly, we believe the trial court abused its discretion by imposing restrictions on how ATI can price its products since such action is not provided for under the Agreement and is not warranted by the record.

■ ATI last contends the trial court abused its discretion in not requiring Dralle to post a bond. ATI notes that the order on the preliminary injunction states that "Dralle has adequate resources to compensate ATI for damages, if any" but the record contains no references to the adequacy of Dralle's resources. Section 11–103 of the Code of Civil Procedure provides:

> "The court in its discretion, may before entering a restraining order or a preliminary injunction, require the applicant to give bond in such sum, upon such condition and with such secu-

rity as may be deemed proper by the court, for the payment of such costs and damages as may be incurred or suffered by any party who is found to have been wrongfully enjoined or restrained." 735 ILCS 5/11—103 (West 1992).

Here, ATI and Dralle had shared a relationship in the industry for several years. The record does not indicate that Dralle has failed to pay for its purchases from ATI or has suffered other financial problems during its tenure as distributor for ATI. We conclude the trial court did not abuse its discretion in not requiring a bond in connection with the issuance of a preliminary injunction.

We hold that Dralle failed to establish the existence of a protectible interest under the Agreement; therefore, the issuance of a preliminary injunction was an abuse of the trial court's discretion. Having so found, we conclude that it is unnecessary to address ATI's contention that Dralle is not entitled to injunctive relief based on the doctrine of unclean hands.

For the foregoing reasons, the judgment of the circuit court of Du Page County is reversed.

Reversed.

McLAREN and BOWMAN, JJ., concur.