SPRINGFIELD RARE COIN GALLERIES, INC., Plaintiff and Counterdefendant-Appellant and Cross-Appellee, v. STEVE MILEHAM, Defendant and Counterplaintiff-Appellee and Cross-Appellant.

Fourth District   No. 4—92—0958

Argued June 22, 1993.—Opinion filed September 9, 1993.

924

Bruce A. Beeman and Stephen M. Osborne (argued), both of Beeman Law Offices, of Springfield, for appellant.

R. Kurt Wilke (argued), of Barber, Segatto, Hoffee & Hines, of Springfield, for appellee.

JUSTICE KNECHT delivered the opinion of the court:

Plaintiff, Springfield Rare Coin Gallery, brought suit against defendant, Steve Mileham, its former employee, for breach of a restrictive covenant. Plaintiff obtained a preliminary injunction and sued for damages. Defendant countersued, alleging conversion of his property by plaintiff. The trial court found the restrictive covenant to be unenforceable as defendant had not obtained any confidential information during his employment and plaintiff did not have a near-permanent relationship with its customers. The trial court found plaintiff did not convert defendant's property; however, it found plaintiff was in possession of property belonging to defendant and ordered the transfer of the property to defendant. Both parties appeal. We affirm the trial court's judgment with respect to the unenforceability of the restrictive covenant, but reverse its finding defendant did not establish the elements of conversion.

## I. FACTS

Plaintiff is in the business of dealing in rare coins and precious metals. James Hausman, plaintiff's president, began operating his first coin business out of his home in 1975. The plaintiff corporation was formed at a later date. Defendant, Steve Mileham, began working part-time for his father's coin business in the late 1960's, and worked full-time for the business between 1973 and 1986.

In 1986, defendant approached Hausman regarding the possibility of employment with plaintiff. Hausman testified since defendant was the son of a local competitor, he (Hausman) was concerned if plaintiff employed defendant, defendant would learn plaintiff's business, and then return to work for his (defendant's) father. Accordingly, plaintiff required defendant to sign a restrictive covenant, agreeing not to compete with plaintiff in Sangamon County for two years after the termination of the employment relationship.

Defendant began his employment with plaintiff in February 1987 and was terminated in January 1989. At the outset of the employment relationship the parties created an account which they termed the "show account." The show account was funded equally by the parties: defendant contributed property valued at $12,456, and plaintiff contributed $12,456 in cash. Defendant paid for his purchases with show account funds, and deposited his sales proceeds in the show ac-

count. Defendant was paid a salary of $7,000 per year, plus half the profits generated in show account transactions.

Initially, defendant worked in plaintiff's store. After a few months, defendant began to devote his time exclusively to the middleman portion of plaintiff's business. Acting as a middleman in the coin and precious metals trade involves buying goods at low prices from small dealers, and selling them at higher prices to larger dealers. Defendant developed purchasing routes to Peoria, Decatur, Champaign, Danville, and St. Louis. Hausman introduced him to some of the coin dealers in these locations, others had been known to defendant prior to his employment with plaintiff. Defendant also learned of other dealers by referring to local telephone directories and by asking dealers if they knew of other dealers in the area; defendant would then make a cold call to their businesses. The parties agreed defendant conducted 95% of the show account business outside of Sangamon County. Hausman testified he had handwritten notes, made on FACTS dealer listing sheets, regarding the financial reliability of dealers he had previously done business with, and he showed these notes to defendant. Defendant testified he did not use this information. Defendant did not take the FACTS sheets with him when he left plaintiff's employ. Hausman also testified he told defendant the profit margin plaintiff had on some items.

The employment contract provided the property in the show account belonged equally to plaintiff and defendant and was to be divided equally between them upon termination of the employment relationship. After the termination of the employment relationship, plaintiff and defendant had discussions regarding distribution of the show account property, but whether they arrived at an agreement regarding the distribution is in dispute. Plaintiff withdrew $71,225.66 as its share of the assets on March 22, 1989. Defendant's share of the assets remains in plaintiff's possession.

After the termination of the employment relationship between plaintiff and defendant, defendant did not return to work for his father, and did not open a business in Sangamon County. However, defendant did continue to do business as a middleman. Defendant traveled to coin dealers' businesses, bought goods from them, and re-sold them to larger dealers.

Plaintiff obtained a preliminary injunction against defendant, prohibiting him from transacting business with any of plaintiff's "protected customers" under the following circumstances:

"1. When Sangamon County is the point of delivery of a product being the subject of the transaction or when the prod-

uct has Sangamon County as a destination (that is, when the outgoing or shipping point is Sangamon County or when Sangamon County is the destination in connection with the purchases or receipt of materials by the defendant); or

2. When the transaction was negotiated or consummated in whole or in part either physically between the Defendant and the customer in Sangamon County or when the transaction or the consummation of the transaction was, in whole or in part, reached by a telephone conversation in which the point of origin or destination was in Sangamon County."

"Protected customers" were defined as those customers meeting both of the following criteria:

"(a) Customers who transacted business with the Plaintiff with a frequency of either once a month, or twelve times within a twelve[-]month period from March, 1987 and before January 17, 1989; and

(b) Customers with whom the Defendant has had no business transactions (including while with B & J Coin Co.) prior to Defendant's employment by Plaintiff in March, 1987."

On July 8, 1991, plaintiff filed an amended complaint requesting damages for breach of the restrictive covenant. Plaintiff alleged defendant had transacted business with 20 to 25 of its protected customers. Plaintiff later limited its claim to five or six customers, *i.e.*, Joel Coen, Dave's Trading Post, Bob Glenn, Speciality, and Blue Diamond. Defendant conceded he had not transacted business with these customers prior to becoming affiliated with plaintiff. The parties disagreed regarding whether defendant had transacted business with a sixth customer, Premiere, prior to becoming affiliated with plaintiff. Plaintiff alleged Premiere was a protected customer if Hausman's testimony defendant had not transacted business with Premiere prior to becoming affiliated with plaintiff was accepted as true. However, Premiere would not be a protected customer if defendant's testimony he had transacted business with Premiere's parent company *prior* to becoming affiliated with plaintiff were accepted as true.

It is unclear from the evidence presented at trial whether plaintiff voluntarily ceased transacting business with Joel Coen. Hausman testified he did not continue to do business with Coen because defendant had bought all of the "product," and there was no product available for plaintiff to buy and resell to Coen. However, Hausman was impeached with his deposition testimony, in which he stated he ceased transacting business with Coen because he could receive better prices from other customers. Hausman testified he did not recall introducing

defendant to Premiere, Dave's Trading Post, Speciality or Blue Diamond. However, Hausman testified although he did not introduce defendant to a particular client, on many occasions he instructed defendant regarding whether to do business with the client. Defendant testified he developed Blue Diamond, Dave's Trading Post and Speciality as customers by making cold calls to their businesses.

At trial, plaintiff attempted to prove its damages by presenting evidence of defendant's income and his transactions with various customers. Plaintiff alleged the measure of damages should be the percentage of defendant's income equal to the percentage of defendant's business with plaintiff's protected customers. Plaintiff presented no evidence it had ever been underbid by defendant, it had ever been unable to buy materials for resale as the result of defendant's business, or it had ever been unable to resell materials as the result of defendant's business. Although Perrino initially testified plaintiff could not buy scrap gold to resell due to defendant's business transactions, he was impeached with his deposition testimony in which he acknowledged nothing prevented plaintiff from buying scrap gold and reselling it to other dealers.

As stated, the trial court found the restrictive covenant was unenforceable. In determining defendant did not obtain confidential information while in plaintiff's employ, the court ruled the names of plaintiff's customers were not confidential information. However, the trial court did not specifically address plaintiff's claims that customer information, instructions given to defendant, and pricing information were confidential information.

The trial court ordered plaintiff to return defendant's share of the show account property to defendant. Defendant filed a motion to reconsider, alleging return of property was not the proper measure of damages in a conversion action, and plaintiff should have been ordered to pay defendant a money judgment in the amount of the value of the property, as of the date of the conversion, plus interest. The trial court ruled defendant had not established the elements of conversion and, accordingly, was entitled only to the return of the property. This appeal and cross-appeal followed.

## II. RESTRICTIVE COVENANT

■ Plaintiff alleges the trial court erred in finding the restrictive covenant was not enforceable. Restrictive covenants operate in partial restraint of trade and are scrutinized carefully to ensure their intended effect is not the prevention of competition *per se*. (*Lee/O'Keefe Insurance Agency, Inc. v. Ferega* (1987), 163 Ill. App. 3d 997, 1003,

516 N.E.2d 1313, 1317.) Reasonable restrictive covenants will, however, be enforced under two sets of circumstances: (1) where the former employee acquired confidential information through his employment and subsequently attempted to use it for his own benefit, or (2) where, by the nature of the business, the customer relationship is near permanent and, but for his association with plaintiff, defendant would not have had contact with the customers in question. *Lee/ O'Keefe*, 163 Ill. App. 3d at 1004, 516 N.E.2d at 1318.

## A. *Confidential Information*

Plaintiff alleges the trial court erred in holding defendant did not acquire confidential information during his employment and use it to his benefit after the termination of the employment relationship. A restrictive covenant may be enforced if the employee learned trade secrets or other confidential information while in plaintiff's employ and subsequently attempted to use it for his or her own benefit. (See *Office Mates 5, North Shore, Inc. v. Hazen* (1992), 234 Ill. App. 3d 557, 569, 599 N.E.2d 1072, 1084.) On appeal, plaintiff alleges defendant received the following information: (1) the names of its customers; (2) financial information regarding its customers; (3) instruction on the authentication and valuation of rare coins and collectibles; and (4) its policies regarding price margins. The trial court, in making its written ruling, addressed only the first of the plaintiff's four contentions.

We find the trial court did not err in determining plaintiff's customer list did not constitute confidential information. We conclude the trial court implicitly rejected plaintiff's contentions that the financial information regarding plaintiff's customers, the instructions defendant received, and plaintiff's pricing policies constituted confidential information, and we agree they did not (see 134 Ill. 2d R. 366(b)(3)(i)).

## 1. Customer Names

Under Illinois law, customer lists and other customer information will constitute confidential information *only* when the information has been developed by the employer over a number of years at great expense and kept under tight security. However, the same type of information is not protectable where it has not been treated as confidential and secret by the employer, was generally available to other employees and known by persons in the trade, could easily be duplicated by reference to telephone directories or industry publications, and when the customers on such lists did business with more than one company or otherwise changed businesses frequently so that their identities

were known to the employer's competitors. See *Office Mates*, 234 Ill. App. 3d at 574-75, 599 N.E.2d at 1084.

■ In the present case, plaintiff presented no evidence of any great expense incurred for the development of its customer list. Moreover, the evidence showed plaintiff's customers were well known to others in the trade, could be easily ascertained by reference to telephone directories and trade journals, and did business with and were known to plaintiff's competitors. Accordingly, we find the trial court did not err in finding the names of plaintiff's customers did not constitute confidential information.

### 2. Financial Information Regarding Customers

■ The information regarding the financial reliability of plaintiff's customers was not financial information which was used by defendant after leaving plaintiff's employ. As noted, customer information constitutes confidential information only when the information has been developed by the employer over a number of years at great expense and kept under tight security. (*Office Mates*, 234 Ill. App. 3d at 574, 599 N.E.2d at 1084.) Hausman testified he made handwritten notes regarding the financial reliability of his customers, including whether a given customer was a "fast payer" or "slow payer." The record is devoid of any great expense incurred to develop this information. Moreover, information regarding credit worthiness and payment history is obtainable from credit reporting agencies or by credit references furnished by the customer. This customer financial information did not constitute confidential information.

Additionally, even if such information were considered confidential, the evidence did not establish defendant used this information to his benefit. Hausman testified he showed the handwritten notes to defendant; however, defendant testified he did not use the notes. The evidence additionally established defendant did not take the FACTS listing, upon which the notes were written, with him when he left plaintiff's employ. As plaintiff did not introduce the notes or identify any of defendant's current customers as the subject of such notes, there is no evidence defendant used this information to his advantage after leaving plaintiff's employ.

### 3. Instructions

■ The instruction defendant received regarding the authentication and valuation of rare coins and collectibles was not confidential information. While defendant may have learned or benefitted from this instruction, the determination of whether an employee received

confidential information does not involve an inquiry into whether the employee learned *anything* during his employment, but whether the employee learned a trade secret, confidential process, or the like. Our supreme court has stated:

"Conflicting social and economic policy considerations are present in each trade secret case. A business which may invest substantial time, money and manpower to develop secret advantages over its competitors, must be afforded protection against the wrongful appropriation of confidential information by a prior employee, who was in a position of confidence and trust. At the same time, the right of an individual to follow and pursue the particular occupation for which he is best trained is a most fundamental right. Our society is extremely mobile and our free economy is based upon competition. One who has worked in a particular field cannot be compelled to erase from his mind all of the general skills, knowledge and expertise acquired through his experience. These skills are valuable to such employee in the market place for his services. Restraints cannot be lightly placed upon his right to compete in the area of his greatest worth." (*I L G Industries, Inc. v. Scott* (1971), 49 Ill. 2d 88, 93-94, 273 N.E.2d 393, 396.)

Thus, when the employee merely learns the trade during his term of employment, the employee has not learned confidential information. In the present case, the evidence established defendant attended a seminar to learn about counterfeit coins, and was taught how to grade coins by plaintiff. Clearly defendant could not learn confidential information regarding *plaintiff's* business at a seminar offered by a third party. By receiving instruction from plaintiff, defendant learned techniques integral to the trade of dealing in coins, but he did not learn *confidential* information particular to plaintiff's business.

### 4. Policies Regarding Price Margins

Plaintiff argues its policies on price margins constitute confidential information. Plaintiff and defendant operate as middlemen. One aspect of their trade is dealing in scrap gold. Large dealers publicize the price they are willing to pay for scrap gold. Middlemen such as plaintiff and defendant buy scrap gold from small dealers at a lower price, and resell it to the larger dealers at the publicized price. Plaintiff has developed a pricing policy. Under this policy, plaintiff deducts the amount of profit it wishes to realize from the large dealers' publicized prices in order to determine how much to pay the small dealers for scrap gold. Plaintiff argues defendant, having knowledge of its

pricing policies, knows what plaintiff will offer and can buy the scrap gold from the small dealers by offering one cent more than plaintiff would offer.

Plaintiff directs the court's attention to *Donald McElroy, Inc. v. Delaney* (1979), 72 Ill. App. 3d 285, 389 N.E.2d 1300. McElroy was in the business of recovering silver from photographic film and silver flake extracted from photographic fixer solution. (*McElroy*, 72 Ill. App. 3d at 287, 389 N.E.2d at 1303.) In the market for photographic film, silver recovery companies submit bids to suppliers based in part upon the silver yield which can be expected to be recovered from the film. In the silver flake market, bids for silver flake are calculated by formulae utilizing yield figures based on the recovery capabilities of the equipment used. (*McElroy*, 72 Ill. App. 3d at 289, 389 N.E.2d at 1304.) The reclaiming equipment used by McElroy to obtain silver flake is manufactured exclusively for McElroy. (*McElroy*, 72 Ill. App. 3d at 289, 389 N.E.2d at 1305.) John Delaney was employed by McElroy for seven years, serving as McElroy's purchasing manager and executive vice-president. (*McElroy*, 72 Ill. App. 3d at 288-89, 389 N.E.2d at 1304.) Delaney was the *only* employee who knew all the components used in determining McElroy's bids. (*McElroy*, 72 Ill. App. 3d at 289, 389 N.E.2d at 1305.) Affirming the granting of a preliminary injunction predicated upon a restrictive covenant, the appellate court stated:

"Here, the hearing testimony indicates that Delaney had access to sensitive information while employed by McElroy. This included information about McElroy's equipment, recovery capabilities, yield figures, bidding procedures and suppliers' requirements. In addition, it was shown that Delaney had established customer contacts through close personal involvement with McElroy's suppliers. In combination, this insider information could potentially give defendants an unfair advantage in bidding against McElroy for photographic waste material." *McElroy*, 72 Ill. App. 3d at 293, 389 N.E.2d at 1307.

Plaintiff argues the present case is analogous to *McElroy* because in both cases the businesses were highly competitive and the employees had previous experience in the trade and were, during the period of employment, responsible for the majority of the customer contacts. However, we find the present case distinguishable from *McElroy* for two reasons. First, the pricing policies in *McElroy* were based in part on the recovery capabilities of McElroy's equipment, some of which had been specially manufactured for him. Conversely, the evidence at trial does not establish plaintiff's pricing policies were based on any-

thing other than its desired profits. While a court could determine that knowledge of a pricing policy based on the capacity of specially manufactured equipment might constitute confidential information regarding the employer's business, mere knowledge of the amount of profit desired by the employer does not mandate similar treatment by the court. Second, the court in *McElroy* found the *combination* of information about McElroy's equipment, recovery capabilities, yield figures, bidding procedures and requirements of suppliers gave Delaney's new employer an unfair advantage over McElroy. In the present case, such a combination of factors was not present.

Defendant contends the first district, first division, in *Office Mates*, has distinguished the fourth division's decision in *McElroy* from cases in which customer information is readily available to competitors. In *Office Mates*, the plaintiff alleged information regarding client names, addresses, key contact persons, benefit packages, word processing equipment, products and services, number of employees, and other client information was confidential information. (*Office Mates*, 234 Ill. App. 3d at 575, 599 N.E.2d at 1084.) The court noted this information could be elicited by placing a cold call to the business and asking questions designed to elicit this information. The court stated that when customer information is readily available to competitors through normal competitive means, there is no protectible interest. The court then contrasted *McElroy* with cases involving customer information. (*Office Mates*, 234 Ill. App. 3d at 575-76, 599 N.E.2d at 1085.) This distinction is pertinent with respect to *customer* information; however, with respect to information regarding *plaintiff's own policies*, the distinction made by the court in *Office Mates* is not directly on point.

■ Defendant also argues plaintiff's pricing information was not confidential because dealers in the trade make their prices and pricing formulas available to others. In *Label Printers v. Pflug* (1991), 206 Ill. App. 3d 483, 496, 564 N.E.2d 1382, 1389, the appellate court rejected an argument that pricing information was confidential because many customers would willingly disclose prices being offered by a competitor and plaintiff had not shown its pricing was substantially different from that of the competitors. In the present case although there was no testimony customers would disclose prices being offered by a competitor, defendant testified he disclosed his pricing formula to customers. Defendant additionally introduced into evidence a flier distributed by another dealer setting forth its pricing formula. Defendant also testified other dealers publicize their price formulas, and two dealers have toll-free numbers which may be called to ascertain the

daily price paid for scrap gold. Although plaintiff presented evidence it did not publish its pricing formula, it did not present evidence regarding how its pricing formula is different from those of its competitors, which are readily available.

We are persuaded by the reasoning in *Label Printers*, and find plaintiff's price margins did not constitute confidential information.

### B. *Near-Permanent Relationship*

■ An independent basis for the enforcement of a covenant not to compete exists under the near-permanency test. This two-prong test is satisfied when (1) the employer's relationship with the customers is near permanent, and (2) but for the association with the employer, the employee would not have had contact with the customers. (*Lee/O'Keefe*, 163 Ill. App. 3d at 1004, 516 N.E.2d at 1318.) The First District Appellate Court has noted factors which are relevant to determining whether the near-permanency test has been met, including (1) the number of years required to develop the clientele; (2) the amount of money invested to acquire clients; (3) the degree of difficulty acquiring clients; (4) the extent of personal customer contact by the employee; (5) the extent of the employer's knowledge of its clients; (6) the duration of the customers' association with the employer; and (7) the continuity of the employer-customer relationships. (*Agrimerica, Inc. v. Mathes* (1990), 199 Ill. App. 3d 435, 444, 557 N.E.2d 357, 363.) However, the first district has also recognized the outcome of the near-permanency test turns in large degree on the nature of the business involved. *Office Mates*, 234 Ill. App. 3d at 572, 599 N.E.2d at 1082.

A near-permanent relationship with clients is inherent in the provision of professional services. (See *Nationwide Advertising Service, Inc. v. Kolar* (1973), 14 Ill. App. 3d 522, 528, 302 N.E.2d 734, 738.) Conversely, a near-permanent relationship with customers is generally absent from businesses engaged in sales. Moreover, a near-permanent relationship is not generally present in a business which does not engender customer loyalty by providing a unique product or personal service, and customers of the business utilize many suppliers simultaneously to meet their needs. (*Office Mates*, 234 Ill. App. 3d at 571, 599 N.E.2d at 1082.) Likewise, when the names of the employer's customers are readily ascertainable by reference to the telephone directory or professional publications, or are generally well known by the employer's competitors, the employer will generally be unable to establish the employee would not have had contact with the customers

but for the association with the employer. See *Image Supplies, Inc. v. Hilmert* (1979), 71 Ill. App. 3d 710, 714-15, 390 N.E.2d 68, 72.

■ Where the employer is engaged in the provision of professional services and employs the employee to assist in the provision of these services, and the evidence indicates the employee would not have had contact with the clients but for the association with the employer, the near-permanency test is satisfied. Thus, when an established veterinarian employs a newly licensed veterinarian with no previous affiliation with the community, a covenant not to compete will be enforced. (*Cockerill v. Wilson* (1972), 51 Ill. 2d 179, 184, 281 N.E.2d 648, 651.) Similarly, when an established association of physicians employs a physician with no previous patients of his own and no previous affiliation with the community, a covenant not to compete will be enforced. (*Canfield v. Spear* (1969), 44 Ill. 2d 49, 51-52, 254 N.E.2d 433, 434.) However, even though engaged in providing professional services, when the evidence indicates the clients utilize several providers of the same type of professional services simultaneously, the near-permanency test will not be satisfied. Thus, where the employer is an insurance defense law firm, and the clients of the firm also retain other law firms to do insurance defense work, the law firm does not have a consistent expectation of representing the clients, and the near-permanency test is not satisfied. *Williams & Montgomery, Ltd. v. Stellato* (1990), 195 Ill. App. 3d 544, 554, 552 N.E.2d 1100, 1107.

The sales category is the opposite of the professional services category. When the employer's business is sales of a nonunique product, its customers also do business with its competitors, are generally known to the competitors, or are ascertainable by reference to telephone or specialized directories, the near-permanency test will not be satisfied. Thus, in *Image Supply*, the appellate court determined a printing supply company did not have a near-permanent relationship with its customers where the customers were listed in the telephone directory and three professional journals, and the customers also did business with the printing supply company's competitors. (*Image Supply*, 71 Ill. App. 3d at 714-15, 390 N.E.2d at 72.) Likewise, in *Label Printers* (206 Ill. App. 3d at 493-94, 564 N.E.2d at 1388-89), the court found a printer of pressure sensitive labels did not demonstrate a near-permanent relationship with its customers where its customers also did business with its competitors. Finally, in *Office Mates*, the appellate court determined an office support personnel placement agency did not have a near-permanent relationship with its customers where the customers' names, addresses and nature of business are readily available by way of canvassing, cold calling, and the use of tel-

ephone and specialized directories, and the customers did business with other placement agencies. *Office Mates*, 234 Ill. App. 3d at 572, 599 N.E.2d at 1082.

In *Sarah Bush Lincoln Health Center v. Perket* (1992), 238 Ill. App. 3d 958, 962-63, 605 N.E.2d 613, 616-17, this court recognized these two categories of cases. The employer in *Sarah Bush*, a hospital, sought to enforce a covenant not to compete made by an employee who had been the director of physical medicine and rehabilitation at the hospital. This court examined the nature of the business, concluding the situation was more like that of the professionals in *Cockerill* and *Canfield* than the "ordinary case" in which the employee is in a position such as a salesperson. Accordingly, we upheld the trial court's injunction predicated on the enforcement of the covenant not to compete. *Sarah Bush*, 238 Ill. App. 3d at 963, 605 N.E.2d at 617.

Plaintiff alleges analyzing the nature of the plaintiff's business, as this court did in *Sarah Bush*, is not the proper approach to determining whether the near-permanency test has been met; rather, plaintiff alleges application of the seven factors set forth by the first district in *Agrimerica* is the better approach. While the *Agrimerica* factors may be helpful in some cases, we find they need not be applied in all cases. When a given business falls squarely within one of the two categories of cases this court has previously recognized, the near-permanency determination may be made without resort to the *Agrimerica* factors. However, when a business is lacking some of the characteristics of a category, has characteristics inconsistent with the category in which it would otherwise be placed, or for some other reason does not fall squarely within one of the two categories, the *Agrimerica* factors may be helpful to the court in determining whether the near-permanency test has been met. Thus, for example, when a business is engaged in selling custom-made goods and its clients do not also do business with its competitors, and are not readily ascertainable by reference to available sources, the business does not fall squarely within either of the two categories and the *Agrimerica* factors may be helpful in determining whether the business meets the near-permanency test.

■ In the present case, the trial court resolved the near-permanency issue by analyzing the nature of the business. The trial court concluded:

> "In this case the evidence does not support the argument that a near-permanent relationship has been established. Instead the evidence establishes a large group of coin and pre-

cious metal dealers constantly bartering with each other and always seeking products and business may be available at the nearest store, telephone or fax machine. Businesses likely to be engaged in the services offered by Springfield Rare Coin are not secret, their names are readily available by reference to the yellow pages, attendance at shows, or specialized directories."

We find plaintiff's business falls squarely within the sales category, and the lack of near-permanent relationship with its customers may therefore be ascertained without reference to the *Agrimerica* factors.

Plaintiff is not engaged in the provision of professional services; rather, plaintiff's business, or at least the sector of plaintiff's business with which defendant was affiliated, is that of a middleman. Plaintiff buys coins and precious metals such as scrap gold from small dealers at a low price, and sells them to larger dealers at a higher price. Plaintiff is not the exclusive supplier to its customers. Defendant testified and the trial court found plaintiff's customers also do business with its competitors. Plaintiff's customers are ascertainable by reference to yellow pages, trade directories and attendance at trade shows. The customers may be approached by making cold calls, as evidenced by the testimony that many of the dealers defendant dealt with while in plaintiff's employ were not plaintiff's prior customers, but new customers defendant had contacted by making cold calls.

Plaintiff contends that although defendant might have known the names of other dealers by reference to trade journals, he would not have had access to them but for his affiliation with plaintiff. Although Hausman testified extensively regarding his good reputation, which resulted in the good reputation of plaintiff, this testimony was not corroborated by any other source. No dealers testified they would not have done business with defendant had he not been affiliated with plaintiff. On the contrary, three dealers who began to do business with plaintiff through defendant, *after* defendant became employed by plaintiff, testified they did not do any business with plaintiff prior to being contacted by defendant, and one dealer testified he did not know Hausman until after defendant contacted him. The court could have concluded plaintiff's reputation was not necessary to defendant's access to the dealers. Thus, this situation falls squarely within the sales category, and the trial court properly determined, by virtue of the nature of plaintiff's business and the characteristics it possesses, that it does not satisfy the near-permanency test.

■ Finally, in its reply brief, plaintiff alleges the covenant not to compete in the employment contract should not be treated as a covenant not to compete in an employment contract, but rather as a cove-

nant not to compete in a contract analogous to a contract for the sale of a business. Courts impose a more stringent test of reasonableness on restrictive covenants in employment contracts than they do on restrictive covenants ancillary to the sale of a business. The basis for the distinction rests upon the fact that a purchaser in the sale of a business context holds more bargaining power than an ordinary employee in an employment context. (*Decker, Berta & Co. v. Berta* (1992), 225 Ill. App. 3d 24, 28, 587 N.E.2d 72, 74.) In *Decker*, this court noted the First District Appellate Court had analyzed the distinction between a sale-of-business restrictive covenant and a written covenant as part of an employment contract, and had written:

> " 'Illinois courts have historically distinguished between the two types of covenants, based on the unique interest which each seeks to protect. Whereas a covenant ancillary to an employment contract shields the employer from the possibility of losing his clientele to an employee who appropriates proprietary customer information for his own benefit, and also shields him from the possibility of losing customers with whom he enjoys a near-permanent relationship, a covenant ancillary to the sale of a business ensures the buyer that the former owner will not walk away from the sale with the company's customers and goodwill, leaving the buyer with an acquisition that turns out to be only chimerical.' " (*Decker*, 225 Ill. App. 3d at 29-30, 587 N.E.2d at 75, quoting *Hamer Holding Group, Inc. v. Elmore* (1990), 202 Ill. App. 3d 994, 1007, 560 N.E.2d 907, 916.)

In the present case plaintiff did not purchase a business from defendant; it employed defendant. Although defendant contributed capital to the "show account," he did not purchase plaintiff's interest in the business; he became plaintiff's employee. The covenant is not being invoked to prevent the seller of a business from retaining the company's customers and good will. It is being invoked to prevent a former employee from competing with the business. In short, plaintiff has cited no authority to support its position that its contract was not an employment contract but a contract analogous to a contract for the sale of a business.

### III. CONVERSION

Defendant alleges the trial court erred in ordering plaintiff to transfer the property remaining in the show account to him, rather than granting him a cash judgment in the amount of $71,225.66, plus statutory interest of 5% beginning March 22, 1989. Resolution of this issue turns upon whether the trial court erred in finding his portion of

the show account property had not been converted by plaintiff. This is because the proper award, if conversion has been proved, is generally a money judgment in the amount of the value of the property at the time of conversion, plus legal interest. (*Henkel v. Pontiac Farmers Grain Co.* (1977), 55 Ill. App. 3d 898, 902, 371 N.E.2d 352, 356.) In order to make a case for conversion, a party must establish (1) unauthorized and wrongful assumption of control, dominion, or ownership over the personal property of another; (2) a right to the property; (3) an absolute and unconditional right to immediate possession of the property; and (4) a demand for possession. (*First National Bank v. Lachenmyer* (1985), 131 Ill. App. 3d 914, 917, 476 N.E.2d 755, 758.) Plaintiff contends the determination of the trial court was correct because defendant did not establish two of the elements of conversion: his unconditional right to immediate possession and an unauthorized assumption of control by plaintiff.

Defendant testified he received a letter from Hausman instructing him to submit his valuations of the property in the show account. This letter was introduced into evidence. Defendant testified he made a valuation of the property and had a telephone conversation with Hausman, and at Hausman's request, agreed to increase the value of certain coins by $1,800. Defendant testified he received a later letter from Hausman, dated February 6, 1989, which set forth the valuation of the property, as adjusted in the telephone conversation and containing a settlement proposal. The letter was introduced into evidence and provided, in part: "The settlement proposal is being made subject to review by our legal counsel, our certified public accountant and you. No distribution of assets in any form will be made until all parties are in agreement and until the terms of the employment contract are fulfilled in full to my satisfaction." Defendant testified he made arrangements to pick up his share of the property in the show account on February 7, 1989, but plaintiff prevented him from doing so.

Hausman testified no settlement was ever made regarding the value of the inventory in the show account. Hausman testified he signed a document agreeing to a value of the inventory, but it was never accepted as a settlement. Hausman testified he and the other members of plaintiff's board resolved, on November 27, 1989, that the "assets belonging to [defendant] should not be released." On clarification, Hausman testified this resolution was made based upon legal advice. Hausman testified he took cash from the show account amounting to approximately half of its value. Perrino testified Hausman wrote himself a check for $71,225.66. Hausman testified he made notes of inventory defendant had agreed to. On clarification, Haus-

man testified this was merely a list of the "inventory Steve Mileham has agreed to, not what we have." Hausman further stated the value of this inventory was never agreed upon. It is not clear from the testimony whether "inventory Steve Mileham has agreed to, not what we have" means inventory defendant agreed was property of the show account, or inventory defendant agreed to accept as his share of the show account. Although not necessary to this court's resolution of defendant's cross-appeal, we note the phrase "not what we have" would seem to indicate this inventory was not the inventory plaintiff and defendant had in the show account, but the inventory defendant agreed to accept as his share of the show account, thus supporting defendant's testimony the parties *had agreed* upon valuation and distribution of the property.

Plaintiff alleges defendant did not establish an immediate and unconditional right to possession of the property in the show account and the unauthorized assumption of control over the property by plaintiff because the contract provided the property was to remain in the vault until valuation of the property was determined by agreement or arbitration. Thus, plaintiff alleges, since the parties did not agree to the valuation and the matter was not arbitrated, defendant had no immediate right to possession of the property, and plaintiff's right to retain the property was authorized under the terms of the employment contract. Although plaintiff's summary of the terms of the employment contract is accurate, the position that no agreement was reached and defendant was not entitled to his share of the property until the valuation was agreed upon or determined through arbitration is inconsistent with plaintiff's removal of its share of the property from the show account on March 22, 1989.

Defendant argues by removing $71,225.66 from the show account, plaintiff either believed the valuation of the property had been agreed upon as $142,451.32, or plaintiff chose to waive the contractual provision that all property was to remain in the vault area until the property has been divided by agreement or arbitration. We agree plaintiff's conduct has one of two implications: it either contradicts its contention the valuation had not been agreed upon, or evidences an intention to waive the requirement that all property remain in the vault until the division had been agreed upon. Under either scenario, defendant became entitled to the property on March 22, 1989.

If plaintiff removed its share of the property because it believed the valuation issue *had* been resolved, it cannot allege defendant was not entitled to his share of the property because the valuation issue had *not* been resolved.

■■ If plaintiff did not believe the valuation issue had been resolved, its withdrawal of $71,225.66 from the show account was in contravention of the contractual provision providing all property was to remain in the vault until division had been agreed upon. If plaintiff chose to withdraw what it believed to be its share of the show account property even though division had not been agreed upon or determined by arbitration, it could not require defendant to wait for agreement or arbitration before becoming entitled to his share of the property. A contractual right to arbitration may be waived by a party through conduct inconsistent with the arbitration clause, which would thus indicate that he has abandoned the right to avail himself thereof. (*Applicolor, Inc. v. Surface Combustion Corp.* (1966), 77 Ill. App. 2d 260, 266-67, 222 N.E.2d 168, 171.) Accepting as true plaintiff's contention it did not believe the valuation issue to be resolved, plaintiff waived its right to insist defendant's share of the property remain in the vault until the matter had been arbitrated by withdrawing its half of the property although the matter had not been arbitrated.

Plaintiff seems to argue its removal of $71,225.66 on March 22, 1989, was permissible under the employment contract, because the contract gave it the right to receive its share of the show account property in cash. The contract provided the show account property was to be divided equally between plaintiff and defendant. Thus, plaintiff's "share" of the property was half of the property. Although the contract provision regarding distribution did give plaintiff the right to receive *its half* of the show account property in cash, the employment contract does not give plaintiff the right to remove what it determines to be half of the value of the show account property, in cash, before the value of the show account is determined by agreement or arbitration. Simply put, since the value of half of the property could not be determined until the value of all of the property was determined, plaintiff by definition could not remove "its half" of the property until the valuation was determined.

Moreover, the employment contract required "all property" to remain in the vault of plaintiff's business until divided by agreement or arbitration. The employment contract does not define "property" as being exclusive of cash. On the contrary, the contract provides all property of the show account, including cash, is the "joint *property* belonging equally to employer and employee." Thus, under the terms of the employment contract, the cash, or the checkbook representing access to the cash, was to remain in the vault until the property, including the cash, was divided by agreement or arbitration.

We also note plaintiff's fifth affirmative defense to the counterclaim indicates it did not retain defendant's share of the show account property merely because it believed no agreement had been reached regarding the valuation of the show account property and the matter had not been arbitrated. Rather, plaintiff retained the defendant's share of the show account property as security for satisfaction of the judgment it hoped to obtain against defendant in its action for damages. Plaintiff's fifth affirmative defense states:

> "Defendant intentionally violated the terms of his employment agreement and/or the preliminary injunction ordered by the court and that if said property was turned over to defendant the plaintiff would likely never be able to recover any damages from the defendant."

Plaintiff has referred to no provision in the employment contract or principle under Illinois law which would permit it to retain defendant's property as security for the satisfaction of a judgment it had not yet obtained.

Defendant became immediately entitled to the remaining property in the show account on March 22, 1989, which according to plaintiff's valuation was worth $71,225.66. Plaintiff's continued control over such property was unauthorized. In light of these conclusions and as plaintiff has not challenged defendant's establishment of the other elements of conversion, the trial court's decision defendant did not establish the elements of conversion must be reversed.

The plaintiff has not disputed defendant's contention the proper measure of damages in a conversion action is the value of the property at the time of the conversion, plus interest. Defendant has adopted plaintiff's own valuation of the property on March 22, 1989. Accordingly, we vacate the order requiring plaintiff to transfer the remaining property in the show account to defendant, and remand with directions to enter judgment in favor of the defendant and against the plaintiff in the amount of $71,225.66, plus 5% interest from March 22, 1989.

## IV. Conclusion

With respect to plaintiff's appeal, we determine the trial court did not err in determining plaintiff did not have a near-permanent relationship with its customers. The trial court correctly determined plaintiff's customer list does not constitute confidential information. The customer information and instructions and pricing information received by defendant also did not constitute confidential information.

With respect to defendant's cross-appeal, we find the trial court erred in finding defendant did not establish the elements of conversion. Accordingly, we vacate the order requiring plaintiff to convey the balance of the property in the show account to defendant and remand with directions to enter judgment in favor of defendant and against plaintiff in the amount of $71,225.66, plus 5% interest from March 22, 1989.

Affirmed in part; reversed in part, vacated in part and remanded with directions.

COOK and GREEN, JJ., concur.