CAPSONIC GROUP, a division of Gabriel, Inc., Plaintiff-Appellant, v. ANDREW C. SWICK, Defendant-Appellee.

Second District   No. 2—89—0027

Opinion filed May 1, 1989.

James L. Poznak, of Siegel & Wille, of Oakbrook Terrace, and Sperling, Slater & Spitz, of Chicago (Bruce S. Sperling, of counsel), for appellant.

Willard B. Widerberg and Brady, McQueen, Martin, Collins & Jensen, both of Elgin (Alfred Y. Kirkland, Jr., of counsel), for appellee.

JUSTICE McLAREN delivered the opinion of the court:

Plaintiff appeals from the interlocutory order entered by the circuit court of Kane County on December 14, 1988. That order denied plaintiff's request for a preliminary injunction. The court held that it would not enforce a post-employment restrictive covenant in an employment agreement because the plaintiff failed to establish the existence of trade secrets or confidential information that would constitute a protectable interest. We affirm.

Plaintiff, Capsonic Group (Capsonic), is a division of Gabriel, Inc., a privately owned corporation located in Elgin, Illinois. Capsonic was formed in 1968 and is in the business of designing and manufacturing composite plastic/metal parts. Capsonic uses a process known as insert molding. Insert molding is a relatively new technology whereby metal inserts are molded directly into plastic bodies to create one solid piece. Capsonic's emphasis is in the development of customized automated systems for the manufacture of insert-molded parts. Capsonic uses standard components wherever possible so that it can concentrate its design efforts on the overall automated process. Capsonic has approximately 30 to 40 systems in operation, about one-half of which are automated.

An automated production system involves a number of areas or stations where a particular function is performed and different mechanisms which move the products and materials from station to station. One type of station involves a mold that actually forms the product.

The other type of station consists of various operations which precede and follow the formation of the molded part. Examples of this type of station are probes to detect defective parts, ejectors to remove defective parts, stampers to imprint the parts, cleaning stations, stations to trim excess plastic or metal, testing stations, and packaging stations. Each station requires a machine or "component" to perform these particular tasks. There are a number of ways to accomplish each task, and, therefore, each station and movement involves a design choice.

Defendant, Andrew Swick, became employed by Capsonic as an automation engineer in December 1985. Swick had not worked with insert molding or in the design of automation systems to manufacture insert-molded products previously. Prior to beginning his employment, Swick was required to sign an employment agreement. The agreement included a clause stating that Swick would not disclose any confidential information. The agreement also contained the following non-competition clauses:

"2. That during the period of his employment by CAPSONIC he will not, without the express written consent of CAPSONIC, engage at any time in any business or activity which competes directly or indirectly with the proper business of CAPSONIC or which is in any other way destructive of or harmful to any of the reasonable business interests of CAPSONIC.

3. After the termination of his employment with CAPSONIC, for any reason whatsoever, he will, when such information should remain confidential in order to protect the reasonable business interests of CAPSONIC, refrain from disclosing at any time the names or addresses of any CAPSONIC customers or CAPSONIC'S past or prospective dealings with its customers, the parties, dates or terms of any of CAPSONIC contracts or the nature of CAPSONIC'S trade secrets, systems, processes or methods or any other information obtained by Employee in the course of this employment with CAPSONIC when such information should remain confidential in order to protect the reasonable business interests of CAPSONIC.

4. After the termination of his employment with CAPSONIC regardless of the nature of or reason for termination, except with the written consent of CAPSONIC, Employee will, to protect the reasonable business interests of CAPSONIC, refrain for a period of two (2) years from entering into direct competition with CAPSONIC in connection with any customer or known prospective customer of CAPSONIC by engaging in or in any way advising, aiding or assisting in any business of

manufacturing or selling or otherwise dealing with insert molding products and/or the machines for constructing same, and supplies therefor either as an individual on his own account, or as a partner or joint venturer, or as an employee, agent or salesman of any person or corporation or as a stockholder of any corporation, or in any other manner."

In January 1988, Capsonic revised Swick's employment agreement. This revision did not alter Swick's confidentiality or noncompetition obligations but included a cover letter which outlined certain aspects of these obligations. Swick signed the agreement.

Swick's initial position with Capsonic was as a maintenance engineer. His duties centered on maintaining Capsonic's automated production systems in operation. This included monitoring, testing, repairing, and fine-tuning each system. In 1987, Swick became the manager of Capsonic's automation department. As manager, Swick was responsible for designing the automated production systems as new products were developed and sold by Capsonic. Swick designed three automated systems while at Capsonic and was working on a fourth when his employment was terminated.

In addition to design work, Swick's responsibilities required substantial customer contact. Swick would make formal presentations to customers, participate in progress meetings, and formulate and revise design ideas to meet customers' requirements. Swick was also involved in constructing bids to submit to prospective customers.

In August 1988, Swick was approached by an employment agency representing Altair, a competitor of Capsonic. Swick pursued this employment prospect and, in October 1988, accepted a job with Altair. Capsonic learned of Swick's intent to work for Altair and on November 11, 1988, fired him.

On November 14, 1988, Capsonic filed a verified complaint for injunction against Swick alleging breach of contract, violation of implied duty of loyalty, violation of the Trade Secrets Act, breach of common law trade secrets, and unfair competition. Capsonic also filed a motion for a temporary restraining order (TRO). On November 15, 1988, the court granted Capsonic's motion for a TRO preventing Swick from working for Altair or revealing any information regarding Capsonic's business. The court also set a hearing on a preliminary injunction for November 21, 1988. On November 21, the court entered an order continuing the TRO and continuing the hearing on the preliminary injunction to November 30, 1988. The court heard testimony on November 30, December 1, 13 and 14. At the conclusion of the testimony, the court heard arguments from both counsel. These arguments were pre-

sented off the record. The court concluded that Capsonic had not established a protectable interest and, therefore, a preliminary injunction could not lie. The court entered an order denying Capsonic's request for a preliminary injunction and dissolved the TRO. Capsonic appeals from this order.

The sole issue presented in this case is whether the trial court erred in finding that Capsonic did not establish a protectable interest.

Initially, we note that the appeal is based on the denial of a motion for a preliminary injunction. However, we cannot find in the record that such a motion was ever filed. The pleadings as presented to this court include a complaint and a motion for a temporary restraining order. The motion for a TRO was granted. The complaint will be considered and disposed of at trial. The hearing on the nonexistent motion lasted 3½ days. The legal arguments based on the testimony presented during the hearing were made off the record.

■ The appellant has the burden of presenting a sufficiently complete record of the proceedings of the trial court to support a claim of error. (*Pecora Oil Co. v. Johnson* (1987), 156 Ill. App. 3d 521, 523.) If such a record is not presented, the reviewing court will presume that the trial court's ruling was in conformity with the law and had a sufficient factual basis. (*Pecora*, 156 Ill. App. 3d at 523, citing *Foutch v. O'Bryant* (1984), 99 Ill. 2d 389, 391-92.) Any doubt arising as a result of the incompleteness of the record will be resolved against the appellant. (*Foutch*, 99 Ill. 2d at 392.) We will address the merits of the appeal in the context of the above principles.

■ ■ The denial of a request for a preliminary injunction rests with the sound discretion of the trial court, and this court will not disturb that ruling unless the trial court abused its discretion. (*Chicago Health Clubs, Inc. v. Picur* (1988), 124 Ill. 2d 1, 7-8.) However, in the case at bar, the propriety of a preliminary injunction is dependent upon the enforceability of the restrictive covenant contained in Swick's employment agreement. A post-employment restrictive covenant will be enforced only if reasonable, and that determination is a question of law. (*Barrington Trucking Co. v. Casey* (1969), 117 Ill. App. 2d 151, 156.) Covenants not to compete are, in effect, restraints on trade and will be carefully scrutinized to ensure that their intended effect is not the preclusion of competition *per se*. *The Instrumentalist Co. v. Band, Inc.* (1985), 134 Ill. App. 3d 884, 891.

In determining the enforceability of a restrictive covenant in an employment setting, the test applied by Illinois courts is whether the terms of the agreement are reasonable and necessary to protect a legitimate business interest of the employer. (*PCx Corp. v. Ross* (1988),

168 Ill. App. 3d 1047, 1056, citing *McRand, Inc. v. van Beelen* (1985), 138 Ill. App. 3d 1045; *Reinhardt Printing Co. v. Feld* (1986), 142 Ill. App. 3d 9.) There are two general situations in which a legitimate business interest will exist: (1) where the customer relationships are near permanent "and, but for his association with [plaintiff], [defendant] would not have had contact with the customers"; and (2) where the former employee acquired trade secrets or other confidential information through his employment and subsequently tried to use it for his own benefit. (*PCx Corp.*, 168 Ill. App. 3d at 1057.) Capsonic contends that both of these situations exist in this case.

We find that Capsonic has waived the issue of whether it has near permanent customer relationships. After an exhaustive search of the record, we find that Capsonic never advanced this argument below. It is clear from the record that the only legitimate business interest presented to the trial court was the existence of trade secrets or confidential information. The argument relating to permanent customer relationships, therefore, must be resolved against the appellant. The issue of near permanent customer relationships is deemed waived.

We now turn to the issue of whether it was against the manifest weight of the evidence to determine that Capsonic did not establish a trade secret or confidential information.

A trade secret is a plan or process, tool, mechanism, compound, or informational data utilized by a person in his business operations and known only to him and such other persons to whom it may be necessary to confide. *Hayden's Sport Center, Inc. v. Johnson* (1982), 109 Ill. App. 3d 1140, 1146, citing *ILG Industries, Inc. v. Scott* (1971), 49 Ill. 2d 88, 92.

Our supreme court has stated:

> "It is clear that an employee may take with him, at the termination of his employment, general skills and knowledge acquired during his tenure with the former employer. It is equally clear that the same employee may not take with him confidential particularized plans or processes developed by his employer and disclosed to him while the employer-employee relationship exists, which are unknown to others in the industry and which give the employer advantage over his competitors." (*Schulenburg v. Signatrol, Inc.* (1965), 33 Ill. 2d 379, 387.)

An individual's right to pursue a particular occupation for which he is trained is fundamental. (*ILG*, 49 Ill. 2d at 93.)

> "One who has worked in a particular field cannot be compelled to erase from his mind all of the general skills, knowledge and

expertise acquired through his experience." *ILG*, 49 Ill. 2d at 93-94.

Capsonic relies solely on this court's recent decision in *Televation Telecommunication Systems, Inc. v. Saindon* (1988), 169 Ill. App. 3d 8, to establish the existence of trade secrets. In *Televation*, the defendant memorized a specific schematic of an analog circuitry used to produce a specific product. He then began his own company and produced a similar and competitive product using the exact same circuitry. The court held that the design of the circuity was a trade secret and enjoined the defendant from using or disclosing it to others.

In *Smith Oil Corp. v. Viking Chemical Co.* (1984), 127 Ill. App. 3d 423, this court reviewed a similar case. In *Smith*, the plaintiff/employer was in the business of producing industrial lubricants. Three of the plaintiff's employees went to work for a competitor. We held that the employees could be prohibited from using the exact formulas developed while employed by the plaintiff, but the employees could "develop particular formulas from the use of their own general blending or chemistry skills and may develop comparable or equivalent products even though the ability to do so is from general skills and general experience acquired" while working for the plaintiff. *Smith*, 127 Ill. App. 3d at 430.

■ The case at bar differs from the situation in *Televation*, in that Capsonic is not complaining that Swick has taken a particular design or automated process with him and used it to Capsonic's detriment. There is no specific tangible product here. Additionally, there is no identifiable process that Capsonic claims is secret or confidential. Instead, Capsonic claims its overall expertise in the designing of automated systems is a trade secret. Capsonic alleges that during Swick's tenure at Capsonic, he learned how to choose a particular standard component and combine it with other components to construct an automated production process—a skill that, but for his employment with Capsonic, Swick would not possess. This is exactly the generalized knowledge and expertise our supreme court recognized in *ILG*, and we acknowledged in *Smith*, as not subject to restriction. The manifest weight of the evidence presented at the hearing supports the trial court's conclusion that Capsonic's theory of automated processes is not a trade secret.

■ Capsonic also contends that, even if it has not established protectable trade secrets, it has a protectable interest in its confidential information pertaining to production capability and manufacturing processes, business practices, and customer information. Capsonic's argument is a factual one with no citation to applicable authority.

Capsonic does cite several cases that involve situations where former employees attempted to solicit customers of, or directly compete with, the employer. Those cases involve products that are available in the market place and sold by several or even many distributors. Each distributor has a direct interest in protecting its customer base. See *Donald McElroy, Inc. v. Delaney* (1979), 72 Ill. App. 3d 285 (employer engaged in recovering silver from photographic waste material; ex-employee works for competitor and solicits employer's suppliers); *Office Electronics, Inc. v. Grafic Forms, Inc.* (1978), 56 Ill. App. 3d 395 (employer manufactures and sells paper forms used in business; ex-employee forms company to sell similar products); *Wessel Co. v. Busa* (1975), 28 Ill. App. 3d 686 (employer engaged in the printing business; ex-employee solicits and sells printing services to employer's customers).

The case at bar is vastly different from the cases cited above. The testimony elicited at the hearing establishes that Capsonic's business is project oriented. Capsonic enters into contracts with companies who need a particular part produced. Capsonic receives this business by convincing the companies that it can manufacture this part more efficiently than is currently being done. These contracts tend to be long-term and Capsonic charges a substantial "pull charge" for a company backing out of the contract before the project is completed. Therefore, it appears that it would be very difficult for another company to come in and "steal" Capsonic's current business. Capsonic's concern appears to be that now another company in the industry may become more adept at automated production and cause competition in the future. This is an attempt to restrict competition *per se* and will not be encouraged by the courts. The manifest weight of the evidence supports the trial court's conclusion that Capsonic's theory of automated processes is not confidential information.

For the reasons stated above, we affirm the judgment of the circuit court of Kane County.

Affirmed.

DUNN and INGLIS, JJ., concur.