No.  2--01--0315     

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

DAM, SNELL and TAVEIRNE, LTD., ) Appeal from the Circuit Court

) of Lake County.

Plaintiff-Appellee,  )

) ) 

v. ) No. 00--CH--1318

)

JOHN VERCHOTA and AIMIE S. ) 

ETTNER, )

    ) 

Defendants    ) 

  )  Honorable

(Mary Seda, a/k/a Mary Miller,  ) John R. Goshgarian,

Defendant-Appellant).  )  Judge, Presiding. 

JUSTICE GEIGER delivered the opinion of the court:

Defendant Mary Seda, a/k/a Mary Miller (Miller), appeals from the February 27, 2001, order of the circuit court of Lake County entering a preliminary injunction preventing her from performing any accounting services on behalf of the clients of her former employer, plaintiff Dam, Snell and Taveirne, Ltd. (DST).  On appeal, Miller argues that (1) the restrictive covenant contained in her employment agreement was invalid as a matter of law; and (2) the trial court abused its discretion in entering the preliminary injunction.  We affirm.

The facts relevant to the instant appeal are as follows.  DST is a corporation engaged in public accounting and financial consulting.  At the time in question, DST maintained offices in Libertyville, Fox Lake, and Crystal Lake.  Defendant Miller was an unlicensed accountant and was hired by DST in May 1994 to work in the Crystal Lake office.  At the time Miller was hired, she signed an employment agreement that contained a restrictive covenant.  The covenant provided, in relevant part, as follows:

"In the event of termination of this agreement by either party, the Employee agrees that he/she shall not, either directly or indirectly, in a professional capacity as an individual, a partner of another firm, or as an employee of another individual or firm, for a period of two (2) years after such termination, perform any accounting services as a public accountant for any person, firm or corporation, which is on the Employer's client list at the time of employee termination.  This provision also applies to the clients of any predecessor firm that has since merged or been acquired by the Employer."

In the Crystal Lake office, Miller worked under the direction of John Verchota, who was one of the directors and shareholders of DST.  Verchota had been responsible for opening and managing the Crystal Lake office on behalf of DST.  Early in 1999, Miller and Verchota became romantically involved.

On August 1, 2000, Verchota terminated his employment with DST to begin his own accounting practice in Crystal Lake.  Immediately after his resignation, Verchota began soliciting his clients to go with him to his new accounting firm.  On August 4, 2000, Miller advised DST that she was resigning from the firm and that her last day of employment would be August 18, 2000.  Miller subsequently joined Verchota's new firm, which was called Miller-Verchota.

On November 3, 2000, DST filed a six-count complaint naming Miller, Verchota, and another former DST employee, Aimie Ettner, as defendants.  The only count of the complaint that is relevant to the instant appeal is count III, which sought the entry of injunctive relief against Miller.  The count alleged that, since the termination of her employment with DST, Miller had begun working at Miller-Verchota, where she was performing various accounting services for former clients of DST.  DST alleged that such conduct was a breach of the restrictive covenant contained in Miller's employment agreement and requested that Miller be enjoined from performing any accounting work on behalf of any individuals or entities who had been clients of DST at the time Miller terminated her employment there.

DST subsequently filed a petition for a preliminary injunction against Miller.  At the hearing on the petition, Miller testified that she began to work for DST on May 2, 1994, at which time she signed the employment agreement.  Prior to her employment with DST, Miller had her own accounting business with approximately 25 business clients and 40 to 50 individual clients.  Miller estimated that she brought 80% to 90% of her clients with her to DST.  Miller did not have an accounting degree or license at the time she worked for DST.  She performed various services on behalf of DST clients, including bookkeeping, payroll, computer training, preparing corporate and personal tax returns, and installing rudimentary accounting systems.

Miller testified that she had not decided to resign from DST until August 4, 2000, which was the day that she tendered her resignation.  Miller testified that she decided to resign after another DST employee, Aimee Ettner, had quit.  Miller's resignation letter indicated that she was giving a 14-day notice and would continue working through August 18, 2000.  Miller acknowledged that, during this 14-day period, she worked for only 1½ hours on August 17, 2000, and for 2 hours on August 18, 2000.  Miller testified that she was unable to work for most of this period because she had suffered a rotator cuff tear.  Miller began working at the offices of Miller-Verchota on August 21, 2000.

On cross-examination, Miller testified that since joining Miller-Verchota she had performed accounting services on behalf of businesses or individuals who had been DST clients prior to August 18, 2000.  However, Miller believed that she had not violated her employment agreement because these clients were no longer DST clients on the date that she terminated her employment with DST on August 18, 2000.  In support of her position, Miller explained that Verchota had written a letter to DST on August 10, 2000, identifying approximately 100 clients who were transferring their business to Miller-Verchota and who should be removed immediately from DST's client list.  Miller therefore explained that these people and businesses were no longer DST clients by the time she had joined Miller-Verchota.

John Verchota testified he was a certified public accountant and had opened and managed DST's Crystal Lake office.  Verchota acknowledged that he began a romantic relationship with Miller in 1999 and that he and Miller began living together early in 2000.  Verchota testified that he decided to leave DST on July 25, 2000, and that he prepared a letter to DST making his resignation effective as of August 1, 2000.  Verchota testified that he never discussed the matter with Miller prior to July 25, 2000.

Verchota further testified that on August 1, 2000, he prepared and distributed letters to approximately 100 DST clients  advising them of his departure from DST and inviting them to follow him to Miller-Verchota.  Verchota testified that he did not receive any assistance from Miller in preparing these letters.  Unlike Miller, Verchota had not executed an employment agreement with DST that restricted his business activities upon his departure from the firm.  Verchota received responses to his letters from many DST clients who indicated that they wished Verchota to continue to provide their accounting services.  On August 10, 2000, Miller wrote a letter to DST requesting that these clients be removed from DST's client list.  Verchota testified that Miller owns 30% of Miller-Verchota.

Leonard Dam testified that we was the founder of DST.  Dam testified that DST has been providing comprehensive accounting and financial services for the past 30 years.  The Crystal Lake office had approximately 350 to 400 of the 4,400 clients that were serviced by DST's three offices.  A client list was admitted into evidence that identified all of the clients of DST's three offices as of the time Miller terminated her employment.  Dam testified that, prior to the departure of Miller and Verchota, DST had spent approximately $190,000 in marketing efforts to develop clientele for the Crystal Lake office.  DST targeted as potential clients businesses that had gross revenues between $300,000 and $10 million.  The average longevity of DST's clients was substantial, and the revenue that DST received from particular clients often increased as the clients became more comfortable utilizing the services of DST.  Dam testified that the actual damages sustained by the loss of the clients at the Crystal Lake office could not be accurately determined because of the difficulty in determining the number of clients who would refer other clients, the revenues received from the referred clients, as well as the percentage of growth to be expected from existing clients.

Dam testified that DST had developed proprietary and standardized methods for handling its tax clients, including  billing techniques, clients' job sheets, and acceptance sheets.  All of this information was available to Miller during her employment with DST.  Dam testified that one of the purposes of the employment agreement signed by Miller was to protect DST's client lists and marketing materials.

Cynthia Milczewski testified at the hearing on behalf of DST.  Milczewski testified that she owned a construction company and was a client of DST prior to August 1, 2000.  Milczewski testified that, when she was a client of DST, Miller performed accounting tax services for her.  After receiving Verchota's letter indicating that he was leaving DST, Milczewski decided to take her business to Verchota's new firm.  Milczewski testified that Miller had performed accounting services for her since she had transferred her account to Miller-Verchota.

At the close of the hearing, the trial court granted DST's petition for a preliminary injunction.  The trial court found that  there was a likelihood that DST would be successful on the merits of the case and that DST would suffer irreparable injury if a preliminary injunction was not entered.  In so ruling, the trial court noted that it had found the testimony of Miller to lack credibility.  The trial court also found that Miller had effectively resigned from DST on August 4, 2000.  The trial court's order enjoined Miller from performing any accounting services to any person, firm, or corporation that appeared on the DST client list that had been admitted into evidence.  Miller filed a timely notice of interlocutory appeal.

Miller's first argument on appeal is that the restrictive covenant contained in her employment agreement was illegal and overly broad.  Miller argues that, although DST might have a protectable interest in preventing her from soliciting its clients, it has no legal right to prevent her from providing accounting services to those clients who had decided to change their accounts to Miller-Verchota.  Miller also argues that the restrictive covenant impermissibly prevents her from providing services to all of DST's 4,400 clients, when she had come into contact with only approximately 10% of those clients through her work in the Crystal Lake office.

A postemployment restrictive covenant will be enforced only if reasonable, and that determination is a question of law. 
Capsonic Group v. Swick
, 181 Ill. App. 3d 988, 992 (1989).  Covenants not to compete are, in effect, restraints on trade and will be carefully scrutinized to ensure that their intended effect is not the preclusion of competition 
per
 
se
.  
Capsonic Group
, 181 Ill. App. 3d at 992.  In determining the enforceability of a restrictive covenant in an employment setting, the test applied by Illinois courts is whether the terms of the agreement are reasonable and necessary to protect a legitimate business interest of the employer.  
Capsonic Group
, 181 Ill. App. 3d at 992.  There are two general situations in which a legitimate business interest will exist: (1) where the customer relationships are near permanent and, but for his association with the employer, the former employee would not have had contact with the customers; and (2) where the former employee acquired trade secrets or other confidential information through his employment and subsequently tried to use it for his own benefit.  
Capsonic Group
, 181 Ill. App. 3d at 993.

The restrictive covenant that is the subject of the instant case is not unlike that at issue in 
Wolf & Co. v. Waldron
, 51 Ill. App. 3d 239 (1977).  In that case, the defendant employee had been hired to work as a staff accountant for a partnership of certified public accountants.  
Wolf
, 51 Ill. App. 3d at 240.  At the time of his employment, the employee executed an employment agreement that prohibited him from performing "in a professional capacity" any accounting, auditing, tax consulting or business consulting for any person or business who had been a client of the employer during the period of the employee's employment.  The prohibition remained in effect for a period of two years after the employee's termination of employment.  
Wolf
, 51 Ill. App. 3d at 240.  Upon the termination of his employment, the employee took the files of 27 of the employer's clients and provided accounting services to several of these clients.  
Wolf
, 51 Ill. App. 3d at 241-42.  After the employer filed suit, the trial court found that the employee had breached the terms of the employment agreement and issued a preliminary injunction.  
Wolf
, 51 Ill. App. 3d at 242.

On appeal, the employee argued that the restrictive covenant was contrary to public policy because it contained no geographic limitation and was therefore overly broad and unenforceable.  
Wolf
, 51 Ill. App. 3d at 242.  The reviewing court rejected this argument, holding that the employer could reasonably seek to protect itself from losing its clients to former employees by reason of the familiarity gained with the clients' affairs during the course of employment.  
Wolf
, 51 Ill. App. 3d at 242.  Of particular importance to the court in 
Wolf
 was the fact that the employer had 30-year relationships with some of the clients that the employee had taken from the firm.  The court concluded that the employer had a legitimate interest in protecting these long-standing relationships, and others like them, without interference from former employees.  
Wolf
, 51 Ill. App. 3d at 243.

Other Illinois courts have similarly held that an employer has a protectable interest where its relationship with its clients is "near-permanent."  See 
Office Mates 5, North Shore, Inc. v. Hazen
, 234 Ill. App. 3d 557, 569-71 (1992); 
Frank B. Hall & Co. v. Payseur
, 78 Ill. App. 3d 230, 235-36 (1979).  These courts have noted that employers engaged in a professional or pseudo-professional practice are more likely to maintain "near-permanent" relationships with their client base.  See 
 
Arpac Corp. v. Murray
, 226 Ill. App. 3d 65, 73 (1992); 
Booth v. Greber
, 48 Ill. App. 3d 213, 218-19 (1977).

In light of these authorities, we do not believe that the restrictive covenant in the instant case was overly broad or contrary to public policy.  As noted by the court in 
Wolf
, accountants often have lengthy business relationships with their clients.  
Wolf
, 51 Ill. App. 3d at 243.  Such a conclusion was echoed by the testimony of Miller and Dam, who reported that most of DST's clients had been with the firm for many years.  We therefore believe that DST had a near-permanent relationship with its clients and that DST had a protectable interest in maintaining its client base.  By virtue of their employment, DST employees gained specific knowledge of the needs and services required by DST clients and thus would be in a unique position to provide such services upon termination of employment.  DST had a legitimate interest in protecting its long-standing client relationships without interference from its former employees.  See 
Wolf
, 51 Ill. App. 3d at 243.

Miller complains that the restrictive covenant is somehow invalid because it permits her to solicit former clients of DST but prevents her from providing accounting services to them.  Such an argument is unsupported by authority and is without merit.  DST certainly has a protectable interest in preventing its former employees from both soliciting and performing accounting work on behalf of its former clients.  See
 
Wolf
, 51 Ill. App. 3d at 243.
  Although it is true that the restrictive covenant might have been more effective if it had also prevented Miller from soliciting DST clients, we do not think that the covenant is invalid because it failed to do so.

Nor do we believe that the restrictive covenant was overly broad because it prevented Miller from providing accounting services to all of DST's clients, regardless of whether Miller had provided services for such clients during her employment with DST.  Based on our review of the governing law, we believe that DST had a protectable legal interest in all of its business clients and could lawfully prohibit its former employees from performing accounting services on behalf of any of its clients for a reasonable period of time after the termination of their employment.  See 
Wolf
, 51 Ill. App. 3d at 243.  Accordingly, we conclude that the restrictive covenant contained in Miller's employment agreement was reasonable and enforceable.

Miller's next argument on appeal is that the trial court erred in construing the restrictive covenant to apply to the activities of an unlicensed accountant.  Miller notes that the restrictive covenant prohibits the performance of any accounting services in a professional capacity "as a public accountant."  Miller argues that the term "public accountant" is defined under the provisions of the Illinois Public Accounting Act (the Accounting Act) (225 ILCS 450/0.01 
et
 
seq.
 (West 1998)), as a licensed public accountant who is permitted to express opinions as to financial statements based on audits and examinations of such statements (225 ILCS 450/8 (West 1998)).  Miller argues that, because she is an unlicensed accountant, she cannot perform the work of a public accountant and the terms of the restrictive covenant do not apply to her.

The construction of a restrictive covenant, as with any other contract, is a question of law to be determined by the court.  
Paquette v. Coble
, 271 Ill. App. 3d 1110, 1114 (1995); 
Lucas v. Beaton
, 201 Ill. App. 3d 341, 348-49 (1990).  The court's primary object in construing a contract is to give effect to the intention of the parties, and contract terms must be given their ordinary and natural meaning where the terms are clear and unambiguous.  
Lucas
, 201 Ill. App. 3d at 346-47.  Accordingly, where the contract is unambiguous, there is no need to inquire into the intention of the parties.  
Lucas
, 201 Ill. App. 3d at 347.

We believe that the language contained in the restrictive covenant at issue is unambiguous.  That language plainly prohibits Miller from performing "any accounting services as a public accountant" to any DST client.  We believe that the use of the word "any" was meant to prohibit the performance of all types of accounting services, including bookkeeping, preparation of tax returns, payroll services, and the reviewing of financial statements.  We therefore believe that the restrictive covenant applies to all accounting services provided by the former employee, whether the individual is a licensed or unlicensed accountant.

In so holding, we reject Miller's argument that the restrictive covenant prohibits only those accounting services that could be performed by a public accountant licensed under the provisions of the Accounting Act.  Although the restrictive covenant refers to services performed by a "public accountant," there is no reference in the document to the provisions of the Accounting Act.  Lacking any indication that this term is to be treated with independent legal significance, we will not interpret it in a manner inconsistent with the remainder of the sentence and we decline Miller's invitation to look beyond the four corners of the document in order to create an ambiguity.  
Bruner v. Illinois Central R.R. Co.
, 219 Ill. App. 3d 177, 180 (1991); 
Pinsker v. Kansas State Bank
, 142 Ill. App. 3d 216, 221 (1986).  Rather, we believe that the plain language of the covenant prohibits the performance of any accounting services by the former employee to those individuals or entities who were clients of DST at the time of the employee's departure.  Accordingly, we do not believe that the trial court erred in finding that the provisions of the restrictive covenant applied to the accounting activities of an unlicensed accountant.

Miller's final argument on appeal is that the trial court abused its discretion in entering the preliminary injunction.  Miller argues that DST failed to introduce sufficient evidence demonstrating that it had a likelihood of success on the merits and that it would be irreparably harmed without the injunction.

 A preliminary injunction is a provisional remedy granted to preserve the status quo pending a hearing on the merits of the case.  
Office Mates 5, North Shore, Inc. v. Hazen
, 234 Ill. App. 3d 557, 567 (1992).  A party seeking a preliminary injunction must show that (1) he possesses a clear right or interest needing protection; (2) there is no adequate remedy at law; (3) irreparable harm will result if it is not granted; and (4) there is a reasonable likelihood of success on the merits.  
Office Mates
, 234 Ill. App. 3d at 567.  The decision to grant or deny preliminary injunctive relief lies within the sound discretion of the trial court, and a reviewing court's role is limited to determining only whether the trial court abused that discretion.  
Office Mates
, 234 Ill. App. 3d at 567.  In reviewing the discretion exercised by the trial court, the reviewing court may decide only whether the petition has demonstrated a 
prima
 
facie
 case and that matters should be kept in status quo until the case can be decided on the merits.  
Dixon Ass'n for Retarded Citizens v. Thompson
, 91 Ill. 2d 518, 524-25 (1982).

After a careful review of the record, we agree with the trial court that DST introduced sufficient evidence to support the entry of a preliminary injunction.  The evidence introduced at trial demonstrated that Miller was in breach of the restrictive covenant.  By Miller's own admission, she was performing accounting services to businesses and individuals who had been clients of DST during the period of Miller's employment there.  Such testimony was echoed by a former client of DST, who testified that Miller was providing accounting services to her as an employee of Miller-Verchota.  The evidence introduced at the hearing also supported a finding that DST had no adequate remedy at law and would be irreparably harmed without the entry of injunctive relief.  Dam testified as to the significant effort and monies invested by DST to develop the clientele of the Crystal Lake office and the incalculable loss in revenues resulting from the loss of such clients.  See 
Wolf
, 51 Ill. App. 3d at 243.  Dam also testified as to the proprietary information that Miller had acquired during her employment at DST that would assist her in performing accounting services for former clients of DST.  In light of such evidence, we believe that there is a likelihood that DST will succeed on the merits of its complaint and that the trial court did not abuse its discretion in entering the preliminary injunction.

In closing, we note that our discussion of the evidence introduced at the hearing is offered solely for the purposes of explaining our decision to affirm the preliminary injunction.  The discussion should not be taken as a resolution on the ultimate merits of the case.  Rather, that determination should be made by the trial court on the basis of the evidence presented at trial.

For the foregoing reasons, the judgment of the circuit court of Lake County is affirmed, and the cause is remanded.

Affirmed and remanded.

McLAREN and CALLUM, JJ., concur.